HODGSON RUSS LLP
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone:  (716) 856-4000
Facsimile:  (716) 849-0349
James C. Thoman, Esq.

*Counsel to Plaintiff, Robert L. Mercer,
individually and derivatively as a
shareholder of ESB Labs, Inc.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---

In Re:

IRA LEE
HELEN KOH LEE

                    Debtors.

Case No.: 22−70367−REG

Chapter 7

---

ROBERT L. MERCER, individually and
derivatively as a Shareholder of ESB LABS, INC.,

                    Plaintiff,

v.

IRA LEE
HELEN KOH LEE

                    Defendants.

Adv. Proc. 22-_____

---

## COMPLAINT SEEKING TO EXCEPT DEBT FROM DISCHARGE PURSUANT TO 11 U.S.C. SECTIONS 523(a)(2), (a)(4) AND (a)(6)

Robert L. Mercer ("Mercer"), individually and derivatively as a shareholder of

ESB Labs, Inc. ("ESB") and as plaintiff in the above-captioned adversary proceeding, hereby

brings this Complaint (the "Complaint") to except the debt to Mercer from discharge pursuant to

11 U.S.C. Sections 523(a)(2), (a)(4), and (a)(6), and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to

28 U.S.C. § 1409.

## PARTIES

2.      Upon information and belief, Mr. Lee a natural person who resides at 3

Richmond Avenue, Jericho, New York 11753.

3.      Upon information and belief, Mrs. Lee a natural person who resides at 3

Richmond Avenue, Jericho, New York 11753.

4.      Mercer is an individual and fifty-percent shareholder of ESB.

## BACKGROUND AND NATURE OF THE ACTION

5.      On or about March 3, 2022 (the "Petition Date"), Ira Lee ("Mr. Lee") and

Helen Koh Lee ("Mrs. Lee," and together with Mr. Lee, the "Debtors" or "Defendants") filed a

voluntary petition under chapter 7 of title 11 of the United States Code (the "Code") with the

United States Bankruptcy Court for the Eastern District of New York (the "Court").  On the

Petition Date, Kenneth P. Silverman, Esq., was appointed trustee in this case (the "Trustee").

6.      On April 17, 2019, long before the Petition Date, Mercer brought an

action, individually and derivatively as a fifty-percent shareholder of ESB, against Mr. Lee

(ESB's other fifty-percent owner and sole officer), Helen Lee, HighRock, Inc. ("HighRock"),

and Cannonbox, Inc. ("Cannonbox") in New York State Supreme Court, Nassau County (Index

No. 605310/2019) (the "State Court Action").  *See* **Exhibit 1**.  Mercer asserted claims for, *inter alia*, fraud, breach of fiduciary duty, and misappropriation.

7.       As set forth in the State Court Action, from in or around February 2013 through in or around February 2019, Defendants intentionally, knowingly, and deceptively stole at least hundreds of thousands of dollars from Mercer and ESB by secretly inflating the costs of services and goods charged to Mercer and ESB through third-party entities that Debtors owned and controlled.  For many years, Mr. Lee used these third-party entities—HighRock and Cannonbox (together, the "Lee Related Entities")—to obtain services and goods at one price, marked up the costs of those services and goods, and then secretly and fraudulently passed along the marked-up costs to Mercer and ESB as if they were the actual costs of the goods and services.  By and through their control of the Lee Related Entities, Mr. Lee and his wife, Mrs. Lee, improperly pocketed the inflated markups on the goods and services in order to fraudulently and improperly steal hundreds of thousands of dollars from Mercer and ESB.

8.       Mercer has had a long-term interest in the game of billiards in the United States.  Mercer has studied the game and, among other things, invested time and money trying to create technological innovations to improve the game of billiards and attract greater public interest in the game.

9.       From in or around February 2013 though in or around February 2016, Mercer entered into a business relationship with Mr. Lee, who expressed a similar interest in improving the game of billiards in the United States.  At no point during that relationship did Mr. Lee disclose that he was going to inflate and mark up the costs of goods and services actually

incurred by Mr. Lee through HighRock or otherwise in order to take concealed profits for himself.

10.    Mercer paid a salary to Mr. Lee of at least approximately $350,000 for a period of less than two years with the understanding that Mr. Lee would work diligently and be honest and straightforward about, among other things, the costs actually incurred and subsequently paid for by Mercer.  Mercer's total deposits into HighRock over this period, at least approximately $2,568,184 (*see* **Exhibit 2**), accounted for approximately ninety-four percent of all deposits into HighRock's bank account (*see* **Exhibit 3**), and thus Mr. Lee was working nearly exclusively for Mercer.

11.    Mercer and Mr. Lee subsequently agreed to form a new entity together, ESB.  Mr. Lee induced Mercer, a businessman with diverse interests and limited time to devote to daily management of the entity, to trust that Mr. Lee would manage their joint venture appropriately as the sole officer, while Mercer would be the sole provider of funds and capital and extend the money necessary to support their endeavors, as well as create and contribute to the technology that the two were developing together.  But instead of managing their joint interests responsibly, Mr. Lee took advantage of Mercer's resources and good nature for his own financial gain.

12.    Not satisfied with receiving payment from ESB for his own time to the tune of over approximately $1,300,000 in the three short years of ESB's existence, Mr. Lee also devised a scheme to profit nefariously from hidden markups arising from the costs of goods and services incurred by ESB.  Mr. Lee conducted ESB's business primarily through the Lee Related

Entities, which he justified by claiming it was somehow easier, when in reality, he planned to and did profit from this arrangement without Mercer's knowledge or approval.

13.     ESB had no employees, as Mr. Lee decided to have Cannonbox hire independent contractors who billed Cannonbox for their time, which in turn billed ESB.  Mr. Lee represented that this process of having contractors of Cannonbox bill their time to Cannonbox, which in turn billed their time to ESB, was easier than simply having the contractors bill their time directly to ESB.

14.     Yet, unbeknownst to Mercer, Cannonbox did not pay these contractors the amounts reflected in invoices paid by ESB.  Instead, Mr. Lee inflated the actual expenses for the time of Cannonbox contractors when invoicing ESB for their time, and thus took the undisclosed markups to line his own pockets at the expense of ESB and Mercer, secretly profiting by at least approximately $108,000. *See* **Exhibits 4** (row 1); **Exhibit 5** (detail of Cannonbox receipts).

15.     Mr. Lee made the majority of ESB's transactions through HighRock, which he represents is owned by Mrs. Lee.  Instead of having ESB enter into contracts with third-party vendors for goods and services, Mr. Lee had HighRock step in between ESB and the third-party vendors.  Mr. Lee directed the third-party vendors to bill HighRock for the goods and services, he and Ms. Lee marked up the costs of those same goods and services, and then had HighRock charge ESB for the marked-up, inflated costs.

16.     When HighRock invoiced ESB, HighRock overstated the actual costs of goods and services for these third-party vendors, sometimes to the tune of at least an approximately 300% hidden markup.  *See* **Exhibits 4-7**.  To hide this nefarious self-dealing, HighRock did not pass along the true and actual third-party invoices to Mercer, as Mr. and Mrs.

Lee knew that Mercer would continue to fund ESB based on Mercer's misplaced trust that Mr.

Lee would have ESB's and Mercer's best interests at heart.

17.     Each and every time Mr. Lee submitted an invoice and/or charged ESB

and Mercer for marked-up costs for goods and services, Mr. Lee was making false

representations to ESB and Mercer regarding the true and actual underlying amounts charged by

the third-party vendors for these same goods and services.

18.     After certain red flags came to light of the improper dealings by Mr. Lee,

Mercer engaged a third party to conduct a financial audit of the books and records of ESB.

When confronted by the findings of the auditors, Mr. Lee admitted that he and the Lee Related

Entities profited without Mercer's knowledge and approval, both before and after ESB's

formation, through steering transactions through the Lee Related Entities and misrepresenting

and concealing the true, actual costs of goods and services from Mercer so that Mr. Lee, the Lee

Related Entities, and Mrs. Lee could profit from this deception by taking secret profits.

19.     For example, Mr. Lee secretly profited over approximately $138,000 on

transactions with a single vendor, Telemetrics.  *See* **Exhibit 6**.  Mr. Lee went as far as to obtain

two invoices from the vendor showing different amounts, the greater of which he submitted to

Mercer for reimbursement to ESB, all the while Mr. Lee, through HighRock, actually paid the

vendor the lesser, true invoice.

20.     When confronted, Mr. Lee admitted that the invoices he submitted to ESB

and to Mercer did not reflect the true and actual costs of the services rendered to ESB.  And

while Mr. Lee made convoluted excuses as to why he did not pass along the lower price to ESB,

Telemetries itself has since directly contradicted Mr. Lee's story.

21.     As a result, Mr. Lee, through HighRock, stole over at least approximately $138,000 from ESB on services paid for this vendor alone, and lied in an attempt to explain his conduct.

22.     Mr. Lee also abused Mercer's trust by failing to ensure that patent applications—containing inventions that they jointly developed (and which were funded by ESB)—accurately named both of them as inventors, and by failing to accurately name ESB as the owner of the patent applications, despite the fact that Mercer has loaned at least approximately $350,000 to ESB to pay for legal services on these patent applications.

23.     Mr. Lee was aided in his wrongdoing by his wife, Mrs. Lee, and the Lee Related Entities.

24.     Defendants' long-standing pattern of intentional deception and fraudulent activity involved substantial misrepresentations and/or material omissions to Mercer and those representing Mercer that induced Mercer to pay for costs and services borne by Mr. Lee and ESB, both before and after the formation of ESB.

25.     Mercer has advanced at least approximately $13,000,000 to ESB in reliance on these misrepresentations, material omissions, and misleading statements, and thus both he and ESB have been substantially damaged by Defendants' conduct.

I.     **PLAINTIFF'S EARLY RELATIONSHIP WITH MR. LEE**

26.     In or about August 2012, Mr. Lee began providing billiards lessons to Mercer at Mercer's New York home.

27.     In or about October 2012, shortly after they first met, Mercer and Mr. Lee started to discuss the use of new technologies, including simulation software and integrated video, to enhance the game of carom billiards.  In or about February 2013, Mr. Lee and Mercer had begun to conduct business together to develop these technologies using Mercer's funds.

28.     From the outset, Mr. Lee supplied Mercer with other billiards services. Mr. Lee procured special equipment for Mercer through third-party vendors and the Lee Related Entities.  In addition, Mr. Lee began to assist Mercer in Mercer's plans to host an invitational three-cushion billiard tournament (the "Tournament").

29.     Carom billiards is a game played with three balls on a pocketless pool table.  The object of a variant of carom billiards, known as three-cushion billiards, is to strike one or the three balls (specifically the player's own cue ball) in such a way that before it stops moving, it strikes each of the other two balls at least once, and before it strikes the second of the other balls, it contacts one or more of the cushions at least three times.

30.     It is difficult to predict the path that the balls will take, or what the optimal scoring shot would be based on the table configuration.

31.     Mercer and Mr. Lee sought to solve these problems.  They endeavored to invent technologies together that could track billiards shots and suggest how a player should approach different table configurations.  The invention they developed uses technologically enhanced billiards tables, cameras, and sensors with the goal of being able to predict the best possible shots from a given configuration (the "Billiards Inventions").

32.    Mercer and Mr. Lee collaborated extensively to develop the technology. At Mercer's direction, Mr. Lee took care of day-to-day operations of setting up a research lab, purchasing equipment, and hiring contractors.  Mr. Lee reported his progress to Mercer and periodically sent Mercer bills for reimbursement.

33.    Mercer and Mr. Lee frequently discussed the physics and mechanics required to create the Billiards Inventions, and jointly contributed to their creation.  For example, in a July 2013 email, Mercer detailed to Mr. Lee a refined algorithm for accurately detecting the edge of the billiards ball in order to track its movements and computing the precise distance between it and other balls.

34.    Beginning in or about November 2013, Mercer began funding Mr. Lee through HighRock to perform work on Mercer's behalf on various billiards-related projects.

35.    Mr. Lee coordinated with vendors on behalf of Mercer.  Typically, Mr. Lee suggested a product or course of action via email, along with an assessment of cost. Following Mercer's approval, Mr. Lee procured the item and sent an invoice to Mercer.  Mercer then directed one of his aides to pay the bill either by mailing a check or sending money via wire.

36.    Typically, Mr. Lee sent Mercer an invoice for these expenses on HighRock letterhead, which also included bills for Mr. Lee's own time.

37.    For example, on or about September 9, 2014, Mr. Lee sent Mercer an email attaching a HighRock invoice along with an explanation of costs.  The invoice related to costs incurred by HighRock on behalf of Mercer for lighting, 3D modeling, and camera

simulation services.  Sometimes, Mr. Lee also included a timesheet explaining the costs of his services.

38.    In working on the Billiards Inventions for and with Mercer from in or around approximately February 2013 through in or around February 2016, Mr. Lee conducted business transactions through HighRock.  He purchased assets, paid contractors, and leased space for a lab through that entity.  He originally paid himself through HighRock, but later retained himself through Cannonbox at a higher rate.

39.    Each month, Mr. Lee emailed Mercer and his aides an explanation of the prior month's progress on the Billiards Inventions, along with a summary of costs and expenses. Most expenses were stated on HighRock invoices, including for work with third parties.  Only a few invoices came directly from the vendor or consultant.

40.    Mr. Lee represented to Mercer that these were the true and actual costs of goods and services.  In reliance on these amounts, Mercer's aides wired the stated expenses to Mr. Lee's HighRock bank account.

41.    The table below sets out the amounts Mercer paid in reliance on Mr. Lee's reporting of expenses, beginning in or around July 2014, although payments began earlier.  From in or around July 2014 through in or around February 2016, Mercer paid at least approximately $2,568,184 directly to Mr. Lee, through HighRock.  *See* **Exhibit 2.**

**Summary of Mercer**
**Payments to HighRock Pre-ESB**
**(July 14, 2014 - March 31, 2016)**

| Date | Amount Paid by Mercer to HighRock[1] |
|------|----------------------------:|
| 7/14/2014 | $150,000 |
| 9/16/2014 | $41,018 |
| 12/1/2014 | $145,278 |
| 1/30/2015 | $259,080 |
| 5/12/2015 | $284,477 |
| 6/22/2015 | $137,775 |
| 7/2/2015 | $364,273 |
| 8/12/2015 | $570,238 |
| 9/17/2015 | $164,332 |
| 10/9/2015 | $162,716 |
| 11/20/2015 | $72,039 |
| 12/23/2015 | $69,122 |
| 1/28/2016 | $60,180 |
| 2/29/2016 | $87,666 |
| Total | $2,568,184 |

42.     As demonstrated in the table below, payments from Mercer accounted for 94% of all of HighRock's incoming deposits during this period.  *See* **Exhibit 3**.

**Summary of HighRock Deposits Pre-ESB**
**(July 14, 2014 -March 31, 2016)**

| Payor | Amount[2] | Pct |
|-------|-------:|-----:|
| Mr. Mercer | $2,568,184 | 94.0% |
| Paypal | $63,500 | 2.0% |
| Ok Billiard | $33,973 | 1.0% |
| Kim Soo Chan | $26,289 | 1.0% |
| Other Deposit | $19,082 | 1.0% |
| Heather Shemilt | $15,208 | 1.0% |
| Amazon | $3,179 | 0.0% |
| Mario A. Camacho | $3,110 | 0.0% |
| Check Deposit | $890 | 0.0% |

---

[1] Total amounts are rounded to the nearest whole dollar.
[2] Total amounts are rounded to the nearest whole dollar.

| | | |
|---|---:|---:|
| Al Italia | $731 | 0.0% |
| Abracadabra | $350 | 0.0% |
| Rok Billiards | $237 | 0.0% |
| First Bank Merchant Service | $190 | 0.0% |
| Hampton Inn Suites | $89 | 0.0% |
| Expedia | $63 | 0.0% |
| Fee-Wire | $25 | 0.0% |
| US Foreign Exchange | $1 | 0.0% |
| Total | $2,735,101 | 100.0% |

43.     These monthly expenses included an hourly rate Mr. Lee charged Mercer for his services.  Through in or around November 2014, Mercer paid Mr. Lee $100 per hour.  In or around November 2014, Mercer agreed to begin paying Mr. Lee $250 per hour for work relating to software engineering and development.

44.     By Mr. Lee's own written admission, Mr. Lee billed Mercer directly through Cannonbox, and Mercer paid, at least approximately $350,000 solely for Mr. Lee's own time over this time period.

45.     Mr. Lee was compensated for more than this amount over the course of his business relationship with Mercer, which began as early as in or about February 2013.

46.     Mercer was not aware that Mr. Lee was secretly profiting through HighRock or Cannonbox during their pre-ESB relationship, as Mr. Lee represented that the invoices he was submitting were the true and actual costs of goods and services.

47.     Mr. Lee admitted in writing that "[i]t is true that HighRock earned profits from those transactions [between ESB/Mercer and HighRock and Cannonbox], both *before* and *after* the formation of ESB . . . ."

48.      Despite requests from financial auditors, Mr. Lee has not turned ever the full records of the Lee Related Entities for the time period between in or about October 2012 and in or about February 2016, after which Mercer and Mr. Lee formed ESB.

49.      From the incomplete records that financial auditors were able to review, it is unclear whether Mr. Lee paid out the full amounts received by Mercer to the various vendors he claimed the expenses were due.

50.      What is clear is that Mr. Lee did not always pay these vendors in full in a single payment, but instead paid out installments over time to outside accounts.

51.      Mercer has been unable to verify the owners of these accounts and has been unable to confirm that payments were made in full by HighRock to these vendors.

52.      The full extent of damages caused by Mr. Lee and Lee Related Entities to Mercer, based on Mr. Lee's admitted conduct over the period between at least in or about February 2013 to in or about February 2016, is unknown.

## II.      THE FORMATION OF ESB

53.      In or about February 2016, Mercer and Mr. Lee incorporated ESB in order to formalize their venture and to encapsulate the ongoing tab work and eventual intellectual property that the two were jointly developing.

54.      From the outset, Mercer and Mr. Lee were fifty-percent equal shareholders, with Mr. Lee as President and sole officer.

55.      Mr. Lee was, at all relevant times, president of ESB and responsible for its day-to-day operations, including maintaining its books and records.

56.     Mercer funded ESB through promissory notes, received status reports, and contributed to ESB's work.

57.     Mr. Lee suggested and in fact continued the previous billing practice: nearly all expenses and costs were handled through the Lee Related Entities, and then Mr. Lee would cause the Lee Related Entities to transmit invoices for these expenses to ESB, rather than ESB contracting directly with outside vendors.

58.     Mr. Lee did not inform Mercer that Mr. Lee and the Lee Related Entities would secretly profit from this process.

59.     Mr. Lee did not hire any employees directly through ESB.  Instead, Mr. Lee utilized Cannonbox to engage independent contractors, who billed Cannonbox for their time ostensibly spent on ESB projects.  Cannonbox in turn billed ESB for those contractors' time, including Mr. Lee's own time.

60.     ESB did not benefit from this process and there was no legitimate business reason to use Cannonbox this way.

61.     Mr. Lee claimed that this process was easier for him, when in reality he used Cannonbox to steal money from ESB by inflating invoices.

62.     Since ESB's formation in or around February 2016, Mr. Lee invoiced ESB, and was paid, at least approximately $1,305,000 for his own personal services through Cannonbox.  ESB and Mercer paid these amounts to Cannonbox and Mr. Lee based on Mr. Lee's false representation that Mr. Lee would act in ESB's and Mercer's best interest and properly discharge his fiduciary duties.  When ESB and Mercer paid these amounts to Cannonbox and

Mr. Lee, Mercer did not know that Mr. Lee was secretly profiting on vendor services and products through false mark-ups and false invoices, nor did Mercer know that Mr. Lee was also receiving compensation from Cannonbox for his services to ESB.

63.    Mr. Lee also utilized HighRock as an intermediary to conduct business on behalf of ESB with third-party vendors.

64.    There was no legitimate business reason to use HighRock this way.

65.    Mr. Lee claimed that this process was easier for him, when in reality he used HighRock to steal money from ESB by inflating invoices.

66.    Mercer trusted Mr. Lee to manage ESB responsibly and relied upon the accuracy of Mr. Lee's reports on ESB's expenses.

67.    Mr. Lee never informed Mercer that: (1) Mr. Lee personally profited from ESB outside of direct compensation for his time; and (2) that the Lee Related Entities marked up and profited off of third-party vendor bills by inflating the costs of these services in reports provided to Mercer.

## III.    **MERCER'S FUNDING OF ESB**

68.    Beginning in or around April 2016, Mercer began funding ESB's work by loaning money to ESB on a regular basis in reliance upon the amounts Mr. Lee stated he needed to cover ESB's expenses.  ESB issued promissory demand notes to Mercer as evidence of these loans, signed by Mr. Lee as President of ESB (the "Notes").

69.     Mercer funded ESB in exchange for a promissory note almost monthly from in or around April 2016 through in or around January 2019, when Mercer ceased funding and directed that a financial audit of the company be conducted.

70.     In total, Mercer deposited at least approximately $10,558,174.41 into ESB's accounts, which represents the principal owed on the Notes.

71.     As of May 3, 2022, these Notes have accrued a combined interest of at least approximately $2,589,834.26.

72.     Mercer was the sole funder of ESB's operations.  Mercer made these loans in reliance upon Mr. Lee's representations of the progress of the research towards the patentable inventions, and based on Mr. Lee's representations regarding ESB's true and actual costs, ostensibly proven by invoices Mr. Lee submitted.

73.     Due to Mr. Lee's misconduct and misrepresentations, none of these Notes were repaid.  ESB defaulted on the entire principal sum of approximately $10,558,174.41, plus interest.

IV.     **MR. LEE REPORTS ON ESB'S BILLIARDS INVENTIONS
WHILE FAILING TO ACCURATELY ASSIGN INVENTORSHIP
AND OWNERSHIP OF THE PATENT APPLICATIONS**

74.     Beginning in or about April 2016, Lee, on behalf of ESB, hired an intellectual property law firm to apply for foreign and domestic patents for three families of inventions that ESB was developing, as well as for various trademarks.

75.     Between in or about April 2016 and in or about February 2019, the firm invoiced ESB for approximately $383,809 in fees and approximately $39,072.42 in costs relating to this work on behalf of ESB.

76.     To date, ESB, using Mercer's funds, has paid all but approximately $59,295.84 towards these invoices, which reflects invoices submitted between in or about January 2019 and in or about March 2019, including for time billed after Mercer directed Mr. Lee to cease work on ESB pending the results of a financial audit, discussed further below.

77.     In an email dated on or about April 25, 2016, Mr. Lee told Mercer that he "started communicating with law firm Hamilton Brook Smith Reynolds (hbsr.com) to file patents for all of our billiards ideas."

78.     Mr. Lee acknowledged that the Billiards Inventions were jointly created by Mercer and Mr. Lee.

79.     Mercer relied on Mr. Lee's representation in believing that Mr. Lee would direct the firm to ensure that both Mr. Lee and Mercer, as well as ESB, were duly named on patent applications.

80.     In reliance on these representations, Mercer continued to loan funds into ESB, in part to pay for expenses related to the patent applications.

81.     Mercer learned that despite the fact that Mercer contributed, in whole or in part, to conception of numerous claims contained within these patent applications, and despite Mr. Lee's representation that the law firm was hired to "file patents for all of *our* billiards ideas," Mr. Lee did not duly name Mercer as a co-inventor on any of the patent families.

82.     Based on an email sent by an attorney at the firm to Mr. Lee on or about March 11, 2019, which Mr. Lee subsequently forwarded to Mercer, the firm had previously informed Mr. Lee of the importance of properly naming inventors, *i.e.*, those who "contributed to the conception of at least one claim in a patent," on patent applications, lest the validity of the patent be jeopardized.

83.     By not naming Mercer as an inventor on the patent families in which he should have properly been named an inventor, Mr. Lee has jeopardized the validity of those patent applications.

84.     Mercer has learned that despite ESB wholly funding the costs of prosecuting these patent and trademark applications, and despite the fact that the inventions were developed using ESB resources, Mr. Lee has failed to provide proof that the final, "nonprovisional" patent applications have been assigned to ESB.

85.     In other words, there is no evidence that the United States Patent and Trademark Office recognizes that ESB "owns" the patent applications.

86.     In failing to name Mercer as an inventor on the patent families, and in failing to name ESB as the owner of the patent applications, despite the facts above, ESB and Mercer were damaged.

87.     Each time Mr. Lee reported ESB's expenses to request funding from Mercer, he included an overview of the progress he was making on the Billiards Inventions. These reports were always optimistic about the progress and pace of the Billiards Inventions.

Mr. Lee never represented that there were issues with the projects until the Billiards Inventions were revealed not to work at a critical moment.

## V.     THE BILLIARDS INVENTIONS ARE
##        <u>REVEALED NOT TO WORK AS PROMISED</u>

88.     In or about October 2012, Mercer first conveyed his idea to Mr. Lee to host the Tournament.  While organized by another Mercer entity, the Tournament was planned to be in part a showcase of ESB's Billiards Inventions.

89.     In the months leading up to the Tournament, Mr. Lee consistently failed to meet deadlines to demonstrate and test the technology, while promising that he would be ready for the Tournament.

90.     When the Tournament took place in or about August 2018, the technology did not live up to Mr. Lee's representations.

91.     For example, while ESB was to provide technologically enhanced billiards tables that were tested and ready for demonstration, Mr. Lee only produced the final tables the week of the Tournament.

92.     While the tables and related technology were supposed to automate scoring and gameplay through the use of sophisticated sensor and camera systems, the technology did net function as intended and was unusable for the Tournament.

93.     In an email on or about August 10, 2018 to Mercer, Mr. Lee was apologetic for the failures, admitting that he "fell short of [his] own expectations" and that the "installation was less ideal than [he had] ever imagined it would be."

94.    Yet Mr. Lee continued to assure Mercer that the billiard inventions could ultimately be successful.  He stressed that many people were "extremely impressed with the potential value of ESB technology," and that the technology could ultimately be a great success.

## VI.    MR. LEE'S SCHEME TO SECRETLY PROFIT OFF OF ESB IS REVEALED

95.    Following the disappointing deployment of the Billiards Inventions at the Tournament, and the lack of progress thereafter, Mercer grew skeptical of Mr. Lee's representations, in particular ESB's high operating costs relative to its tangible benefits.

96.    In or about January 2019, Mercer began to question the veracity of Mr. Lee's expenses, and requested invoices and explanations of certain expenses.

97.    Mr. Lee delayed providing a full accounting in response to these requests.

98.    In or about February 2019, Mercer hired an accounting firm, Citrin Cooperman ("Citrin"), to conduct a forensic accounting investigation into ESB's books and records.

99.    In or about February 2019, Mercer informed Mr. Lee that Mercer would not continue funding ESB operations until the audit was complete, and directed Mr. Lee to stop incurring expenses on behalf of ESB without prior approval.

100.    At this time, Mercer had no knowledge that Mr. Lee profited, either directly or through the Lee Related Entities, from his work on ESB outside of direct compensation for his time, which as previously noted, has totaled at least approximately $1,305,000 in just the past three years that ESB has been operating.

101.    Citrin made several document requests of Mr. Lee, and Mr. Lee again engaged in a pattern of delaying production of routine financial documents.  For example, at times Citrin accountants followed up with Mr. Lee at least three times before Mr. Lee provided any response to their requests.

102.    Upon information and belief, Mr. Lee resorted to these dilatory tactics in order to falsify some supporting records.

103.    Because Mr. Lee had been engaging third-party vendors through the Lee Related Entities, and then apparently passing through those costs to ESB through new invoices from the Lee Related Entities, Citrin was engaged to inspect the Lee Related Entities' records so it could confirm that amounts Mr. Lee charged ESB were in fact the true and actual amounts the third-party vendors charged to the Lee Related Entities, and were for the sole benefit of ESB.

104.    Mr. Lee had never provided underlying third-party invoices to Mercer that reflected that Mr. Lee or the Lee Related Entities were billed a lower amount for goods or services than what Mr. Lee represented to Mercer were the true and actual costs of these transactions.

105.    Mr. Lee consistently represented that the true and actual costs of goods and services rendered to ESB were reflected in invoices sent to ESB.

106.    To the extent that invoices submitted to ESB for payment did not reflect the true and actual costs of goods and services paid by Mr. Lee or the Lee Related Entities, Mr. Lee or the Lee Related Entities made affirmative material misrepresentations and/or materially omitted the true and actual value of goods and services.

107.    Mercer relied on these representations in continuing to loan money to ESB to pay its bills on a nearly monthly basis.

108.    As a result of its audit, Citrin found numerous examples of improper conduct in Mr. Lee's management of ESB, which amount to at least approximately $316,620 in self-dealing, secret payments, and/or unsupported charges submitted to ESB's and Mercer's detriment and to Mr. Lee's or the Lee Related Entities' benefit.  *See* **Exhibits 4-7.**

109.    Citrin found that there was a discrepancy between the amounts invoiced by Cannonbox and paid by ESB for the contractors' time, on the one hand, and the amounts reported by Cannonbox on the contractors' IRS 1099 forms and paid by Cannonbox, on the other hand.

110.    Although Mr. Lee provided explanations for some of these discrepancies, Citrin found that Mr. Lee, through Cannonbox, billed ESB at least approximately $108,845 for contractors' time that was never paid out by Cannonbox to these contractors.  *See* **Exhibit 5**. This total does not include discrepancies between amounts Mr. Lee billed for his own time and the amounts Mr. Lee withdrew from Cannonbox into his personal bank account.

111.    Citrin also found that Mr. Lee, through HighRock, overbilled ESB at least approximately $138,758 for services rendered by a single vendor, Telemetrics.  *See* **Exhibit 6**.

112.    In fact, Mr. Lee submitted false invoices for the Telemetrics charges.

113.    Mr. Lee represented that the cost of Telemetrics goods and services on HighRock invoices was approximately $928,988 when he submitted those invoices to Mercer on various dates illustrated in the table below.  *See* **Exhibit 6**.

### HighRock Profits at ESB's Expense – Telemetrics[3]

| Invoice Date | Vendor | Invoice provided to HighRock | Invoice provided to ESB | Date Sent by Lee to Mercer | Amount Paid by ESB to HighRock | Amount Paid by HighRock to Telemetrics | HighRock Profit |
|---|---|---|---|---|---|---|---|
| 3/21/2018 | Telemetrics | Q12988-01 | Q12988-02_5% | 3/26/2018 and 4/25/2018 | $13,368 | $12,665 | $704 |
| 3/21/2018 | Telemetrics | Q12932-06 | Q12932-06_5% | 2/28/2018 | $607,366 | $511,605 | $95,760 |
| 4/18/2018 | Telemetrics | Q12951-03 | Q12951-03_5% | 2/28/2018 and 4/25/2018 | $132,435 | $114,094 | $18,341 |
| 2/13/2018 | Telemetrics | Q12953 | Q12953_5% | 2/28/2018 | $115,847 | $97,555 | $18,292 |
| 4/2/2018 | Telemetrics | Q12984-02 | Q12984-02_5% | 4/25/2018 | $19,808 | $16,680 | $3,128 |
| 6/22/2018 | Telemetrics | Q12950-02_D10 | Q12950-02_D05 | 4/25/2018 | $36,480 | $34,560 | $1,920 |
| **ESB/HighRock Total** | | | | | $925,303 | $787,159 | $138,144 |
| | | | | | | | |
| 7/1/2018 | Telemetrics | | Q13051_D10 | 5/31/2018 | $3,685 | $3,071 | $614 |
| | | | | | | | |
| **ESB/High Rock Adjusted Total** | | | | | **$928,988** | **$790,230** | **$138,758** |

114.    In fact, HighRock paid Telemetries approximately $138,758 less than
what HighRock charged ESB for the same goods and services, which Citrin verified by
inspecting outgoing payments from HighRock to Telemetrics.

115.    When confronted by Citrin about this discrepancy, Mr. Lee admitted that
Telemetrics had provided a second invoice, signed by Mr. Lee, for the true and actual cost of the
goods and services, which was approximately $138,758 less than what Mr. Lee represented they
were to Mercer.

116.    On or about April 2, 2019, in an attempt to explain this conduct to Citrin,
Mr. Lee stated in writing that he "lobbied" for Telemetrics to pass on to ESB a discount that he
ultimately was only able to secure for HighRock.  Mr. Lee admitted in writing that he only

---

[3] Total amounts are rounded to the nearest whole dollar.

passed on a marginal discount to ESB, and pocketed at least approximately $138,758 that he caused ESB to overpay to HighRock over the true and actual costs of goods and services HighRock was charged by Telemetrics, calling it his "dealer margin."

117.    Mr. Lee has also explained that Telemetrics did not allow Mr. Lee to tell ESB or Mercer what the true costs of goods and services for these projects were, due to a confidentiality agreement between HighRock and Telemetrics regarding pricing.

118.    Information provided by a Telemetrics representative on or about April 16, 2019, reflected that Mr. Lee's story is false.

119.    On or about April 16, 2019, the Telemetrics representative stated that Telemetrics would have allowed ESB to pay the discounted price that it charged HighRock for these goods and services.  In fact, a Telemetrics representative specifically told Mr. Lee when he provided Mr. Lee the true price quote that if HighRock were to resell these goods and services, it was to give the end user (here, ESB) the same price that Telemetrics charged HighRock, and was not to mark up the costs.

120.    Mr. Lee intentionally and materially misrepresented and/or omitted the true and actual costs of services provided by Telemetrics for ESB, and secretly profited, through HighRock, at least approximately $138,758 on this vendor alone.

121.    Citrin also found that Mr. Lee, through HighRock, overbilled ESB at least approximately $50,546 for services provided by other vendors. The table below provides information on some of these false charges.  *See* **Exhibit 7**.

**HighRock Profits at ESB's Expense – Vendors Other than Telemetrics[4]**

| Vendor | HighRock Invoice # | Date Invoice Transmitted to Mercer | Amount Paid By ESB to HighRock | Amount Paid By HighRock | Amount Overbilled to ESB | Amount Double Billed to ESB |
|---|---|---|---|---|---|---|
| AJA | 1105 | 3/26/2018 | $25,155 | $19,013 | $6,142 | - |
| Carom Café | *See* Exhibit 1.3A | 4/26/2016 - 1/8/2019 | $173,000 | $156,600 | $16,400 | - |
| Fine Quality Events | 1101 | 3/26/2018 | $12,800 | $4,350 | $8,450 | - |
| Kwang S. Ok | 1043 | 4/25/2016 | $5,236 | - | $5,236 | - |
| Road Cases USA | 1119 | 5/25/2018 | $2,960 | - | $2,960 | - |
| Road Cases USA | 1123 | 7/3/2018 | $2,175 | - | $2,175 | - |
| The Hartford | 1045 | 7/5/2016 | $1,321 | $1,388 | ($67) | - |
| The Hartford | 1063 | 7/6/2017 | $1,368 | $1,361 | $7 | - |
| The Systems Group | 1044 | 5/17/2016 | $5,573 | - | - | $5,573 |
| Verendus | 1096 | 2/28/2018 | $31,002 | $29,656 | $1,346 | - |
| Verendus | 1109 | 4/25/2018 | $57,302 | $55,818 | $1,484 | - |
| Vision Research | 1099 | 4/25/2018 | $840 | - | - | $840 |
| Total | | | $318,732 | $268,186 | $44,133 | $6,413 |
| **Total Overpayment** | | | | | | **$50,546** |

122.    The table above demonstrates that Lee, through HighRock, overbilled ESB approximately 300% for goods and services rendered by one vendor, Fine Quality Events.

123.    On or around April 16, 2019, a Fine Quality Events representative confirmed that HighRock paid Fine Quality Events approximately $4,350 for goods and services rendered to HighRock for ESB's benefit.

124.    On or about April 16, 2019, the Fine Quality Events representative stated that he believed ESB and HighRock were one and the same company, and he believed that Mr. Lee owned both companies.

---

[4] Total amounts are rounded to the nearest whole dollar.

125.    On or about April 16, 2019, the Fine Quality Events representative stated that Fine Quality Events would have provided ESB the same price for these goods and services, approximately $4,350, that it had provided to HighRock.

126.    Yet on or about March 26, 2018, Mr. Lee caused HighRock to bill ESB, and ESB paid based on Mr. Lee's invoice, approximately $12,800 for Fine Quality Events goods and services that would have cost ESB $4,350 had Lee caused ESB to transact directly with Fine Quality Events and/or had Mr. Lee not marked up the invoice for these goods and services on the invoice HighRock sent to ESB.

127.    Mr. Lee, through HighRock, profited approximately 300% off transactions with Fine Quality Events made for the benefit of ESB by using HighRock as a middleman.

128.    Mr. Lee never informed Mercer of the true and actual costs of goods and services provided by Fine Quality Events when he requested reimbursement for these expenses, and instead sent Mercer a HighRock invoice for these same goods and services that contained an undisclosed secret markup of approximately 300%.

129.    Mr. Lee intentionally and materially misrepresented and/or omitted the true and actual costs of services provided by Fine Quality Events for ESB, and secretly profited, through HighRock, at least approximately 300% on this vendor alone.

130.    Citrin found that Mr. Lee, through HighRock, double billed ESB for invoices from at least two vendors, on HighRock Invoice Nos. 1044 and 1099, respectively, transmitted to Mercer on or about May 17, 2016 and on or about April 25, 2018, respectively, in

the amount of at least approximately $6,413.  Mr. Lee has admitted that these double billings occurred.

131.    After Citrin questioned Mr. Lee about a payment he made from ESB to reimburse HighRock for HighRock's payment to an individual, Semih Sayginer, in the amount of approximately $6,000 that had been unsupported by any documentation, Mr. Lee recently produced Invoice #1160, dated on or about August 17, 2017.

132.    According to Citrin's analysis, the number on this invoice does not match the invoice numbers consistent with the time of the transaction, and thus the invoice appears to be a recent fabrication.

133.    For example, the most recent HighRock invoice Citrin has seen is Invoice #1152, which is dated on or about October 26, 2018.

134.    Citrin has also identified that Mr. Lee redeemed approximately 800,000 credit card points earned on ESB credit cards in exchange for 80 gift cards worth $100 each, for a total cash value of at least approximately $8,000.  Mr. Lee has provided no proof of how these cards were used, although he claims, without evidence, that they were distributed to vendors, contractors, and other individuals.

135.    Upon information and belief, Mr. Lee has misappropriated these funds for personal use.

136.    Citrin also found that Mr. Lee incurred credit card fees and interest of at least approximately $3,715, and wire or service fees associated with ESB's checking account of at least approximately $756.

137.    As Mr. Lee was responsible for managing ESB's finances, he could have avoided incurring these fees and interest charges.

138.    On or about April 2, 2019, in response to Citrin's document request from on or about March 20, 2019, Mr. Lee provided a written explanation in which he made excuses for his conduct.

139.    For example, for the first time, Mr. Lee attempted to argue that the massive discrepancies Citrin had identified between the evidence and ESB's books were due to repeated instances of Mr. Lee paying for ESB's expenses out of his own pocket.

140.    Mr. Lee has provided no evidence to support these claims.  And even if true, these excuses would not justify Mr. Lee's pattern of duplicitous self-dealing that Citrin uncovered.

141.    In fact, Mr. Lee admitted, in writing, to self-dealing.

142.    For example, Mr. Lee admitted in writing that "[i]t is true that HighRock carried profits from those transactions [between ESB/Mercer and HighRock and Cannonbox], both *before* and *after* the formation of ESB . . ." (emphasis added.)

143.    Mr. Lee never informed Mercer that he would be making additional profits off of ESB's work over his compensation, which in Mr. Lee's own written words "totaled thirty-one (31) $40k invoices, one (1) $35k invoice, and one (1) $30k invoice," since the formation of ESB alone.

144.    Furthermore, Mr. Lee admitted in writing that he invoiced ESB for administrative work performed by his wife, Mrs. Lee, who files taxes jointly with Mr. Lee, and has benefitted from his wrongdoing, including that which benefitted her company, HighRock.

145.    Mrs. Lee was paid at least approximately $35,200 by ESB for bookkeeping services between in or about 2016 and in or about 2017.  Mrs. Lee was hired through Cannonbox to provide these services, and thus would have had access to both the amounts of expenses incurred by Cannonbox and the corresponding amounts of the expenses invoiced to ESB.

146.    Upon information and belief, Mrs. Lee had knowledge of Mr. Lee and Mercer's business arrangement.

147.    Upon information and belief, Mrs. Lee also had knowledge of the underlying invoices sent to HighRock, her company, by third-party vendors that were used as the basis for invoices HighRock sent to ESB.

148.    Upon information and belief, Mrs. Lee knew that some of the invoices billed to ESB by HighRock contained unjustified markups that benefited the Defendants and HighRock to the detriment of ESB and Mercer.

149.    On or about April 3, 2019, Mercer emailed Mr. Lee two routine documents, a draft promissory note, and a patent assignment agreement in which Mr. Lee would promise to assign all patent applications currently pending to ESB, that if signed, would have induced Mercer to loan ESB funds sufficient to pay the outstanding invoices ESB owes to the intellectual property law firm in the amount of approximately $59,295.84, despite the fact that

Mercer informed Mr. Lee that Mercer would not fund additional services until the audit was complete.

150.    These documents, and the subsequent payment to the law firm, were necessary in order for the firm to continue work to meet an on or about April 8, 2019 filing deadline.

151.    By asking Mr. Lee to sign these documents, Mercer sought to obtain a promise from Mr. Lee that Mr. Lee would ensure that ESB would be recognized as the owner of the intellectual property that Mr. Lee and Mercer conceived, created, invented, funded, and/or developed (at least in part) through ESB resources, because Mercer's investigation revealed that there is no firm evidence that these applications have been properly assigned to ESB.

152.    Instead of signing these routine documents, Mr. Lee refused and instead insisted on delaying the patent application process to ESB's detriment, as resuming these applications at a later time would cause ESB to be liable for additional fees.

153.    Mr. Lee refused to sign these routine documents because he insisted that: (1) ESB was already assigned the patent applications, and (2) that the draft promissory note did not contain any obligation for Mercer to continue funding ESB in the future.

154.    Mr. Lee maintained that the patent applications were already assigned to ESB, despite the fact that a search of the United States Patent and Trademark Office's records reveals that not all nonprovisional applications have been assigned to ESB.

155.    Furthermore, Mercer has never promised to indefinitely fund ESB.  In fact, each executed promissory note permits Mercer to demand payment in full at any time.

156.    On or about April 10, 2019, Citrin and counsel for Mercer confronted Mr. Lee at ESB's offices with evidence of Mr. Lee's self-dealing and other wrongdoing.

157.    In this meeting, despite being informed of his right to retain counsel at any time and being informed that he did not have to answer any question, Mr. Lee made several admissions.

158.    For example, Mr. Lee admitted, "I may not have done everything 100% right."

159.    When confronted with evidence that Mr. Lee had marked up numerous HighRock invoices, Mr. Lee responded, "there were many instances where there was no markup."

160.    When confronted about the massive markup on the Telemetrics invoices, Mr. Lee acknowledged that HighRock kept the vast majority of a discount Telemetrics provided without passing along that value to ESB or even informing Mercer that HighRock was secretly profiting at least approximately $138,758 from those invoices.

161.    In fact, Mr. Lee admitted, "many things were not told to Mr. Mercer."

## VII.    SUPREME COURT ACTION IN NASSAU COUNTY

162.    On April 17, 2019, Mercer filed a lawsuit in New York State Supreme Court, Nassau County seeking to recover for the Damages summarized above and related relief (the "State Court Action").

163.    From the very beginning of the State Court Action, the Defendants stonewalled discovery.  They failed to discharge their obligations with respect to document production and appearance at depositions.

164.    On December 1, 2020, the court in the State Court Action sanctioned the Defendants for various discovery violations.

165.    On December 15, 2021, the Court issued a contempt order against one of the entities leveraged by the Defendants to secretly profit through undisclosed mark-ups.

166.    As a result of the Defendants' discovery misconduct, the court in the State Court Action was forced to extend the case schedule on multiple occasions.

167.    As a result of the Defendants' discovery misconduct, Mercer was unable to conduct appropriate and complete discovery, nor was he given the opportunity to review evidence exclusively in Mr. Lee's possession and control to provide a full calculation of the harm and damages caused by the Defendants' misconduct.

168.    The State Court Action was stayed, as to Mr. and Mrs. Lee only, on March 3, 2022.

## VIII.    SUMMARY OF KNOWN DAMAGES

169.    As a result of Mr. Lee and Mrs. Lee's intentional omissions, misrepresentations, and fraudulent behavior, Mercer has been damaged as follows:

(a) Defendants' secret profit as a result of undisclosed markups for the period of time prior to the formation of ESB in an amount to be determined,

plus pre-judgment interest (amount not yet calculable due to Defendants'

discovery misconduct in the State Court Action);

(b) Mr. Lee's time charged through Cannonbox prior to the formation of ESB in

an amount not less than $350,000, plus pre-judgment interest;

(c) Defendants' fraudulent overbilling of contractors' services and products after

the formation of ESB in the amount of at least $316,620, plus pre-judgment

interest (*see* **Exhibits 4-7**); and

(d) Mr. Lee's compensation from ESB, which was funded solely by Mercer based

on false representations, in an amount not less than $1,300,000, plus pre-judgment

interest (collectively with items (a)-(c) above, the "Damages.").

170.    All of the Damages were incurred by Mercer, as Mercer was the sole

provider of capital and funding to ESB.  Mr. Lee defrauded Mercer and ESB.  Mr. Lee breached

fiduciary duties owed to Mercer and ESB.  Because Mr. Lee engaged in intentional misconduct

as a shareholder and officer of ESB, under applicable law and principles of equity, Mr. Lee

cannot benefit from any judgment obtained on the claims stated herein or in the State Court

Action.  Any such judgment should inure to Mercer's benefit.

## AS AND FOR A FIRST CAUSE OF ACTION
### (AGAINST MR. LEE PURSUANT TO 11 U.S.C. § 523(a)(2)(A))

171.    Mercer repeats and realleges the allegations set forth in paragraphs 1

through 170 above as if fully set forth herein.

172.    11 U.S.C. § 523(a)(2)(A) provides, in relevant part, that a Chapter 7 debtor is not discharged of any debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

173.    Mr. Lee's false representations, purposeful omissions, and otherwise fraudulent behaviors induced Mercer to enter into the foregoing and various agreements and take the actions noted herein.

174.    Prior to ESB's formation, Mr. Lee reported expenses related to the Billiards Inventions and other projects to Mercer, who then transmitted funds to Mr. Lee through HighRock to cover those expenses.  Mr. Lee did not invoice Mercer for the true and actual expenses, and instead inflated expenses in order to improperly obtain undisclosed benefits for himself and the Lee Related Entities.  Mr. Lee has admitted that HighRock overstated expenses prior to the formation of ESB, and that there are "many things [that] were not told to Mr. Mercer."

175.    Prior to ESB's formation, Mr. Lee secretly profited in an amount of not less than $350,000 on payments from Cannonbox that were funded by Mr. Mercer.  Mr. Lee fraudulently induced Mr. Mercer to make payments to Cannonbox based on the false representation that Mr. Lee was acting in Mercer's best interest and in the best interest of the parties' joint business dealings.

176.    After ESB's formation, Mr. Lee did not invoice ESB and Mercer for true and actual expenses, and instead inflated expenses in order to improperly obtain undisclosed

benefits for himself and the Lee Related Entities.  Mr. Lee has admitted that HighRock

overstated expenses after to the formation of ESB.

177.    After ESB's formation, Mr. Lee invoiced ESB, and was paid, at least

approximately $1,305,000 for his own personal services through Cannonbox.  ESB and Mercer

paid these amounts to Cannonbox and Mr. Lee based on Mr. Lee's false representation that Mr.

Lee would act in ESB's and Mercer's best interest and properly discharge his fiduciary duties.

When ESB and Mercer paid these amounts to Cannonbox and Mr. Lee, Mercer did not know that

Mr. Lee was secretly profiting on vendor services and products through false mark-ups and false

invoices, nor did Mercer know that Mr. Lee was also receiving compensation from Cannonbox

for his services to ESB.

178.    Mercer reasonably relied on Mr. Lee's material misrepresentations and/or

omissions of the true and actual expenses when he paid invoices acted as the sole funder and

provider of capital to ESB.

179.    By conducting transactions with third parties through the Lee Related

Entities and then invoicing Mercer on letterhead from the Lee Related Entities, Mr. Lee hid the

true and actual expenses from Mercer, thereby pocketing the difference between the true and

actual expenses and the overstated expense amounts he reported to Mercer.

180.    Mr. Lee's intentional misrepresentation and/or omission of the true and

actual expenses demonstrates his intent to defraud and deceive Mercer: the only reason for

misstating the expenses as greater than the true and actual amount was so Mr. Lee could pocket

the difference for himself.

181.    The markup did not represent a legitimate cost of services for Mr. Lee's time, as Mr. Lee was concurrently invoicing Mercer for Mr. Lee's personal services.

182.    Based on the foregoing, Mr. Lee incurred a debt by false pretenses, a false representation, or actual fraud.

183.    Mr. Lee's material misrepresentations and/or omissions caused Mercer to suffer substantial actual and ascertainable harm in the amount of not less than the Damages.

184.    As a result of the foregoing, Mercer is entitled to judgment denying Mr. Lee's discharge of debts owed to Mercer in an amount not less than the Damages pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.

## AS AND FOR A SECOND CAUSE OF ACTION
### (AGAINST MRS. LEE PURSUANT TO 11 U.S.C. § 523(A)(2)(A))

185.    Mercer repeats and realleges the allegations set forth in paragraphs 1 through 184 above as if fully set forth herein.

186.    11 U.S.C. § 523(a)(2)(A) provides, in relevant part, that a Chapter 7 debtor is not discharged of any debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

187.    As previously alleged, Mr. Lee committed fraud against Mercer.  The Lee Related Entities knowingly participated and/or substantially assisted in the fraud because Mr. Lee sent false invoices with unjustified markups through HighRock to Mercer, which Mercer paid to HighRock.

188.     Mrs. Lee provided substantial aid to Mr. Lee's scheme.  Mrs. Lee is an owner of HighRock.  She enabled and assisted Mr. Lee in using HighRock to hide the true and actual expenses from Mercer.  As an owner of HighRock, Mrs. Lee knew that Mr. Lee was making secret profits by using HighRock to bill Mercer.  Ms. Lee, as ESB's bookkeeper, had knowledge of Mr. Lee's scheme, and she benefitted from that scheme by directly or indirectly receiving payments resulting from that scheme.

189.     Based on the foregoing, Mrs. Lee incurred a debt by false pretenses, a false representation or actual fraud.

190.     Mrs. Lee's material misrepresentations and/or omissions caused Mercer to suffer substantial actual and ascertainable harm in the amount of not less than the Damages.

191.     As a result of the foregoing, Mercer is entitled to judgment denying Mrs. Lee's discharge of debts owed to Mercer in an amount not less than the Damages pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.

**<u>AS AND FOR A THIRD CAUSE OF ACTION</u>**
**(AGAINST MR. LEE PURSUANT TO 11 U.S.C. § 523(A)(4))**

192.     Mercer repeats and realleges the allegations set forth in paragraphs 1 through 191 above as if fully set forth herein.

193.     11 U.S.C. § 523(a)(4) provides, in relevant part, that a Chapter 7 debtor is not discharged of any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

194.    As a result of their business relationship prior to ESB's formation and Mercer's advancement of funds for their joint business efforts, Mr. Lee owed fiduciary duties of care and loyalty to Mercer.

195.    As a fifty-percent owner of ESB, and as ESB's President, Mr. Lee owed fiduciary duties to Mercer and to ESB, which included a duty of undivided loyalty and care, such that Mr. Lee was not permitted to utilize his position to secure undisclosed benefits for himself.

196.    Mr. Lee also owes Mercer and ESB a duty of candor, which required him to speak honestly about all facts that were material to their relationship.

197.    Mr. Lee violated these duties by conducting transactions with third parties through the Lee Related Entities and then invoicing Mercer and ESB on letterhead from the Lee Related Entities for amounts that included secret markups.  Mr. Lee thus hid the true and actual expenses from Mercer, and Mr. Lee benefitted at Mercer's expense.

198.    Mr. Lee's conduct harmed Mercer personally, as Mercer personally loaned or otherwise extended funds to ESB based on and in reliance on Mr. Lee's false representations of ESB's expenses.  Because Mr. Lee caused ESB to spend the money he illegally caused Mercer to lend to ESB, Mercer was personally harmed in the amount of the Damages.

199.    Mr. Lee also violated these duties by representing to Mercer that Mr. Lee would ensure that both Mr. Lee and Mercer were duly named on any patent applications filed in connection with the Billiards Inventions, stating that the intellectual property law firm he hired would work to "file patents for all of our billiards ideas."

200.    Mr. Lee's conduct harmed Mercer personally, as Mercer personally loaned funds to ESB based on and in reliance on Mr. Lee's false representations that he would be named as a co-inventor.

201.    Mercer loaned ESB millions of dollars of which approximately $1,300,000 were received by Mr. Lee as compensation for his time spent allegedly working on the billiard technology that failed to perform.

202.    Based on the foregoing, Mr. Lee incurred a debt to Mercer for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

203.    Mr. Lee's breach of fiduciary duty owed to Plaintiff, caused Mercer to suffer substantial actual and ascertainable damages.

204.    As a result of the foregoing, Mercer is entitled to judgment denying Mr. Lee's discharge of debt owed to Mercer in an amount not less than the Damages pursuant to Section 523(a)(4) of the Bankruptcy Code.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (AGAINST MRS. LEE PURSUANT TO 11 U.S.C. § 523(A)(4))

205.    Mercer repeats and realleges the allegations set forth in paragraphs 1 through 204 above as if fully set forth herein.

206.    11 U.S.C. § 523(a)(4) provides, in relevant part, that a Chapter 7 debtor is not discharged of any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

- 39 -

207.    As previously alleged, Mr. Lee owed Mercer and ESB fiduciary duties. Mr. Lee breached those duties by abusing his position to over report expenses to Mercer, thereby damaging Mercer by causing him to enter into loan agreements with ESB.

208.    Mrs. Lee provided substantial aid to Mr. Lee's scheme.  Mrs. Lee is the owner of HighRock, and she allowed Mr. Lee to use HighRock to hide the true and actual expenses from Mercer.  On information and belief, as the owner of HighRock, Mrs. Lee knew that Mr. Lee was making secret profits through ESB to Mercer's detriment.

209.    Mrs. Lee also provided substantial aid to Mr. Lee's scheme because she was hired through Cannonbox to act as ESB's bookkeeper.  On information and belief, she processed ESB's expenses while knowing the discrepancy between the true and actual expenses and the amounts ESB paid.

210.    Mrs. Lee's material misrepresentations and/or omissions caused Mercer to suffer substantial actual and ascertainable damages in an amount not less than the Damages.

211.    As a result of the foregoing, Mercer is entitled to judgment denying Mrs. Lee's discharge of debt owed to Mercer in an amount of not less than the damages, plus pre-judgment interest pursuant to Section 523(a)(4) of the Bankruptcy Code.

## AS AND FOR A FIFTH CAUSE OF ACTION
## (AGAINST MR. LEE PURSUANT TO 11 U.S.C. § 523(A)(6))

212.    Mercer repeats and realleges the allegations set forth in paragraphs 1 through 211 above as if fully set forth herein.

213.    11 U.S.C. § 523(a)(6) provides, in relevant part, that a Chapter 7 debtor is not discharged of any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

214.    For several years, from in or around February 2013 through in or around February 2019, Mr. Lee intentionally, knowingly, and deceptively stole at least hundreds of thousands of dollars from Mercer by secretly inflating the costs of services and goods charged to Mercer and ESB through third-party entities that Lee owned and controlled.

215.    Mr. Lee used the Lee Related Entities, to obtain services and goods at one price, marked up the costs of those services and goods, and then willfully and maliciously passed along the marked-up costs to Mercer and ESB as if they were the actual costs of the goods and services.

216.    By and through their control of the Lee Related Entities, Mr. Lee improperly pocketed the inflated markups on the goods and services in order to fraudulently and improperly steal hundreds of thousands of dollars from Mercer and ESB, and as a result, Mercer has been damaged.

217.    Based on the foregoing, Mr. Lee incurred a debt for willful and malicious injury to Mercer and to ESB.

218.    As a result of the foregoing, Mercer is entitled to judgment denying Mr. Lee's discharge of debt owed to Mercer and to ESB in an amount not less than the Damages pursuant to Section 523(a)(6) of the Bankruptcy Code.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (AGAINST MRS. LEE PURSUANT TO 11 U.S.C. § 523(A)(6))

219.    Mercer repeats and realleges the allegations set forth in paragraphs 1 through 218 above as if fully set forth herein.

220.    11 U.S.C. § 523(a)(6) provides, in relevant part, that a Chapter 7 debtor is not discharged of any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

221.    For several years, from in or about February 2013 through in or around February 2019, Mrs. Lee intentionally, knowingly, and deceptively stole substantial sums of money from Mercer by secretly inflating the costs of services and goods charged to Mercer and ESB through third-party entities that Mrs. Lee owned and controlled.

222.    Mr. Lee, aided and abetted by Mrs. Lee, used the Lee Related Entities, to obtain services and goods at one price, marked up the costs of those services and goods, and then willfully and maliciously passed along the marked-up costs to Mercer and ESB as if they were the actual costs of the goods and services.

223.    By and through their control of the Lee Related Entities, Mr. Lee and Mrs. Lee, improperly pocketed the inflated markups on the goods and services in order to fraudulently and improperly steal substantial sums from Mercer and ESB, and as a result, Mercer has been damaged.

224.    Based on the foregoing, Mrs. Lee incurred a debt for willful and malicious injury to Mercer and to ESB.

225.    As a result of the foregoing, Mercer is entitled to judgment denying Mrs. Lee's discharge of debt owed to Mercer and to ESB in an amount of not less than the Damages, plus pre-judgment interest pursuant to Section 523(a)(6) of the Bankruptcy Code.

**JURY DEMAND**

226.    Mercer demands trial by jury to the extent that any claims, defenses, or issues in this case are triable by jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Mercer respectfully requests that this Court enter an Order denying Debtors' discharge with respect to debts owed to Mercer and to ESB pursuant to section 523(a)(2), (a)(4), and (a)(6) of the Bankruptcy Code.

Dated:  June 3, 2022

HODGSON RUSS LLP

By:  ___/s/ James C. Thoman_____
       James C. Thoman, Esq.
Hodgson Russ LLP
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone:  (716) 856-4000
jthoman@hodgsonruss.com

*Attorneys for Plaintiff, Robert L. Mercer, individually and derivatively as a shareholder of ESB Labs, Inc.*

16190864v9