UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                          Case No.: 22-70367-reg

Ira Lee and Helen Koh Lee,                                      Chapter 7

                                    Debtors.
--------------------------------------------------------x
Robert L. Mercer,
individually and derivatively
as a Shareholder of ESB Labs, Inc.,

                                    Plaintiff,                  Adv. Pro. No.: 22-08045-reg

                -against-

Ira Lee and Helen Koh Lee,
                                    Defendants.
--------------------------------------------------------x

## DECISION

Before the Court is an adversary proceeding to determine the non-dischargeability of a

yet unliquidated debt allegedly owed by the Debtors, Ira ("Ira") and Helen ("Helen") Lee, to the

Plaintiff, Robert L. Mercer ("Mercer"), both individually and derivatively, in his capacity as a 50

percent shareholder of ESB Labs, Inc. ("ESB") (Together, Ira and Helen are referred to herein as

the "Debtors"). Mercer alleges that from 2014 to 2016 he and Ira engaged in a joint venture to

advance the game of three-cushion billiards in the United States. In 2016, Mercer and Ira formed

the corporation, ESB, to carry out their objectives. That business relationship lasted until January

2019. Mercer provided the funding, over $10 million in total, and Ira provided the billiards and

software engineering expertise necessary to achieve their goals.

In a nutshell, Mercer alleges that Ira secretly profited on transactions between entities Ira

owned and/or controlled and Mercer and ESB, by the use of, among other things, undisclosed

invoice markups, and as a result Ira owes a debt to Mercer: (1) for money obtained by false

pretenses, false representations and actual fraud; (2) for fraud or defalcation while acting in a

fiduciary capacity; and (3) for willful and malicious injury. *See* 11 U.S.C. §§ 523(a)(2)(A), (4),

(6). Mercer alleges that Helen aided and abetted Ira's alleged wrongful acts and seeks a judgment

of non-dischargeability against her as well. As damages, Mercer seeks to recover from the

Debtors the "secret profits" and all wages and salary paid to Ira during their business

relationship.

Ira does not dispute that Mercer has established a debt – as against himself, not Helen –

for purposes of this § 523 analysis.[1] He also has not disputed that he owed Mercer and ESB a

fiduciary duty arising out of their pre-petition business relationship. He admits that he made

mistakes in not disclosing the markups to Mercer, and that he failed as a bookkeeper. Ira's

primary defense is that Mercer incurred no damages because, among other things, Mercer failed

to prove that he and ESB paid more than fair value for the goods and services provided even as

marked up. Ira also maintains that HighRock and Cannonbox, the entities through which Ira

provided goods and services to Mercer and ESB, were at all times for-profit entities, and Mercer

should have known that there would be markups. In addition, Ira attempts to justify presenting

marked up invoices to Mercer by explaining that Ira "earned" the markups because (a) he was an

integrator of some of the technology that was sold to ESB, and (b) he worked long hours that

were not otherwise compensated. Finally, he argues that Ira provided goods and services to

---

[1]     Mercer filed a proof of claim in the case in an unliquidated amount based on allegations made in
a pre-petition state court complaint he filed against Ira and Helen and certain of their wholly-owned
business entities. As of this date, no objection to that claim has been interposed and it is *prima facie*
evidence of the validity of the claim. Fed. R. Bankr. P. 3001(f). The complaint in this § 523 action does
not ask this Court to reduce that claim to judgment; it only asks that the debt to Mercer, as evidenced by
the proof of claim, be found non-dischargeable. For purposes of this Decision, this Court will assume a
debt exists, as conceded by Ira in his post-trial brief. Defs.' Post-Trial Br., ECF No. 43, at 13.

Mercer in the end of their business relationship that remain unpaid, and those amounts should offset any amount he owes Mercer.

At trial, the Court determined, and the parties agreed, that resolution of the issues would be bifurcated. As a result, the first phase of this Court's analysis will focus on non-dischargeability of the alleged debt under §§ 523(a)(2)(A), (4) and/or (6). The next phase will focus on the amount of the damages, if any. This case highlights the importance of understanding the critical distinction between establishing the existence of a liability between a debtor and its creditors and then what a court needs to find to determine whether that liability is nondischargeable. These are two distinct concepts that are highlighted in this case.

This matter requires the Court to consider the rights of parties to conduct business in a fair and arms-length manner without fear their conduct may be subject to being found to be a violation of state or federal law. However, when a party acts in a manner inconsistent with those laws the Court has a duty to enforce those laws. The record before the Court establishes that the parties here were not engaged in typical arms-length commercial transactions. Mercer provided the funding and Ira the expertise in a joint effort to advance their common goals with respect to the game of billiards. As a fiduciary, Ira failed in his obligation of full disclosure to Mercer. Based on the testimony and evidence presented at trial, the Court finds it was Ira's intention to mislead Mercer as to the true nature of his billing practices to induce Mercer to continue funding the venture. Ira's attempt to explain his behavior as harmless mistakes and poor bookkeeping are not credible.

For these reasons and the reasons that follow, the Court finds that Ira's debt to Mercer, if any, is non-dischargeable under §§ 523(a)(2)(A) and (4). Mercer's claims against Ira under § 523(a)(6) will be dismissed, as will his claims against Helen under §§ 523(a)(2), (4), and (6).

## JURISDICTION

A proceeding to determine dischargeability under § 523 of the Bankruptcy Code is a core proceeding over which the Court has jurisdiction. *See* 28 U.S.C. § 157. This Decision represents the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

## FACTS AND ALLEGATIONS

The facts are largely undisputed. Ira has a degree in computer science and a background in software engineering. Pl.'s Proposed Findings of Fact, ECF No. 44-4 (hereinafter referred to as "ECF No. 44-4"), ¶¶ 1-2. He is also a billiards coach with expertise in three-cushion billiards a/k/a "Carom Billiards." *Id.* ¶ 3. Helen is Ira's wife. *Id.* ¶ 4.

HighRock, Inc. ("HighRock") is a company formed by Ira and Helen in around 2003. ECF No. 44-4, ¶ 5. HighRock's place of business is in Ira and Helen's home. *Id.* ¶ 162. Helen is the sole owner of HighRock and Ira is the President. *Id.* ¶¶ 6-7, 152-55. Both Ira and Helen have check-writing authority and access to HighRock bank accounts. *Id.* ¶¶ 10-11, 159-60. Ira manages HighRock's operations which involve selling billiards-related equipment, giving lessons and hosting billiards tournaments. *Id.* ¶ 13; Defs.' Post-Trial Br., ECF No. 43 (hereinafter referred to as "ECF No. 43"), at 3. Although Helen remained the sole owner and officer of HighRock, she claims that she did not work for the company at any point during HighRock's dealings with Mercer and/or ESB. *See* Aff. Supp. Summ. J., ECF No. 18-4, ¶ 8; Trial Transcript ("Tr.") Oct. 30, 2023 at 141, 167.[2] HighRock was, at all times, intended to be a profit-making entity. Tr. Oct. 30, 2023 at 104-05.

---

[2] There are two Oct. 30, 2023 transcripts on the docket in this case. *See* ECF Nos. 37, 41. The differences are immaterial to this Decision. In this Decision, this Court's references to the Oct. 30, 2023 transcript are to the version found at ECF No. 37.

Cannonbox, Inc. is a company formed by Ira in around 2003. ECF No. 44-4, ¶ 18. Ira is the sole owner and President of Cannonbox. *Id.* ¶¶ 19-20. Cannonbox is in the business of providing technical and computer consulting and software engineering. *Id.* ¶ 21. Like HighRock, Cannonbox is intended to be a for-profit business enterprise. ECF No. 43 at 3.

Mercer is an individual with a long-term goal of attracting a greater public interest in the game of billiards in the United States. Compl., ECF No. 1 (hereinafter referred to as "ECF No. 1"), ¶ 8. He has studied the game and invested time and money in trying to create technological innovations to improve the game of billiards. *Id.*

Ira and Mercer first met in or around 2012 when Ira provided Mercer with three-cushion billiards lessons. ECF No. 44-4, ¶ 30. Shortly thereafter, Mercer and Ira began discussing billiards-related technology, potential inventions, and advancements of the game of three-cushion billiards. *Id.* ¶ 31. In or around 2014, Mercer and Lee began to conduct business together to develop billiards-related technologies using Mercer's funds. *Id.* ¶ 32. Ira set up a research lab, purchased equipment, hired contractors, and took care of the day-to-day operations. Pretrial Memo, Undisputed Facts, ECF No. 30-7, Ex. 6, ¶ 24. The goal was to invent technologies "that could track billiards shots and suggest how a player should approach different table configurations [and] develop [ ] technologically enhanced billiards tables, cameras, and sensors with the goal of being able to predict the best possible shots from a configuration (the "Billiards Technology")." ECF No. 1, ¶ 31. At some point, Ira also began to help Mercer in his plan to host an invitational three-cushion billiards tournament (the "Tournament"). *Id.* ¶ 28.[3]

---

[3]        There was at least one additional element to Ira's work for Mercer which was the development of patents related to the Billiards Technology. Mercer alleged in a pre-petition state court action against the Debtors that Ira wrongfully failed to identify ESB and/or Mercer on patent applications for inventions that Ira represented would be jointly developed and owned by himself, ESB, and Mercer. Mercer alleged that based on representations that the patents would be jointly owned, he loaned money to

From 2014 through 2016, there was no written agreement between Ira and Mercer defining their business relationship. Ira provided goods and services to Mercer for billiards-related projects. Ira reported his progress and sent bills to Mercer on HighRock letterhead. ECF No. 44-4, ¶¶ 34, 37. Mercer's agents reviewed the invoices and Mercer paid Ira through HighRock. Tr. Oct. 30, 2023 at 118-19. This arrangement began on or around July 14, 2014 and ended on or about March 31, 2016 (the "Pre-ESB Period"). ECF No. 44-4, ¶ 39. During the Pre-ESB Period, Mercer paid approximately $2.5 million to HighRock for goods and services. *Id.* ¶ 40. During the course of their business dealings, Mercer was HighRock's largest customer accounting for approximately 94 percent of HighRock's revenue. *Id.* ¶¶ 40-42; Tr. Oct. 30, 2023 at 27. During the Pre-ESB Period, HighRock obtained goods at one price and resold them to Mercer at a higher price without notifying Mercer of the markup. ECF No. 44-4, ¶¶ 43-44. Mercer alleges that of the $2.5 million paid to HighRock in the Pre-ESB Period, there is at least $350,000 that cannot be reconciled to payments HighRock made to its vendors on account of goods provided to Mercer. *Id.* ¶ 48. Also during the Pre-ESB Period, Ira billed Mercer, through Cannonbox, approximately $350,000 for his time. *Id.* ¶ 47; Tr. Oct. 30, 2023 at 160. Ira would issue invoices to Mercer, through Cannonbox, Mercer's agents would review the invoices and Mercer would pay the invoices. ECF No. 43 at 4.

The Pre-ESB Period concluded in or around February 2016 when the parties formed ESB, an entity owned 50 percent by Mercer and 50 percent by Ira. ECF No. 44-4, ¶¶ 25-26; Tr.

---

ESB to satisfy legal fees associated with preparing the patent applications. Although in his initial pleadings Mercer alleged that Ira improperly omitted ESB from the patent applications, Mercer testified at trial that ESB was named in the patent applications. This admission was not addressed by Mercer in his post-trial submission. The Court will assume these allegations to have been abandoned, and they will not be addressed in this Decision.

Oct. 30, 2023 at 29. (The period from February 2016 through January 2019 will be referred to hereinafter as the "ESB Period"). Ira is the President of ESB and its sole officer. ECF No. 44-4, ¶¶ 27-28; Tr. Oct. 30, 2023 at 29. ESB's primary business objective was the development of billiards-related technologies. ECF No. 44-4, ¶¶ 29, 50. Ira was responsible for the day-to-day management of ESB; he had check-writing authority and access to the company bank accounts. *Id.* ¶¶ 54-55. The business objective that existed between Ira and Mercer in the Pre-ESB Period continued, except Mercer's funding was provided to ESB, and in turn, ESB paid invoices from HighRock and Cannonbox. Tr. Oct. 30, 2023 at 37-38.

Similar to the Pre-ESB Period, Mercer was ESB's sole funding source. ECF No. 44-4, ¶¶ 60-61. In total, Mercer loaned or contributed approximately $10,558,174 to ESB to cover expenses. *Id.* ¶ 62.[4] Ira decided that ESB would not hire any employees directly. Rather, Ira billed ESB for services provided by independent contractors employed by Cannonbox, many of whom were friends and colleagues of his. ECF No. 44-4, ¶¶ 64, 78; Tr. Oct. 30, 2023 at 40. Cannonbox submitted monthly invoices to ESB identifying the contractors who worked in a given month, but the invoices did not contain any timesheets or logs. ECF No. 44-4, ¶¶ 64-67; Tr. Oct. 31, 2023 at 49-56. Ira issued Cannonbox invoices to ESB on behalf of Cannonbox and authorized payment of those invoices on ESB's behalf. ECF No. 44-4, ¶¶ 69-70; Tr. Oct. 30, 2023 at 31, 135. Mercer alleges that there is a $108,000 discrepancy between amounts billed to ESB by Cannonbox and amounts paid by Cannonbox to independent contractors working on ESB projects. Pls.' Post-Trial Br., ECF No. 44-1 (hereinafter "ECF No. 44-1") at 13. During the

---

[4] Although the parties agree that these funds were loaned by Mercer to ESB, the notes evidencing these loans were not introduced into evidence, nor were the terms discussed at trial, other than Ira's testimony that he thought they were demand notes. Tr. Oct. 30, 2023 at 97. However, the notes were attached to Mercer's proof of claim in this case, and the Court will take judicial notice of their existence. Mercer's claim against the Debtors is not predicated on these notes, and they are largely irrelevant to this Decision.

ESB Period, Ira billed ESB $40,000 per month, through Cannonbox, for his own services for research and development work. ECF No. 44-4, ¶ 150. Ira's salary, a total of approximately $1.3 million for the ESB Period, was paid by Mercer through his contributions to ESB. *Id.* ¶ 149.

After forming ESB, Ira continued to use HighRock to acquire goods. *Id.* ¶ 81. As with the Pre-ESB Period, HighRock billed ESB for goods that HighRock purchased from third party vendors. *Id.* ¶ 82. Ira was acting both on behalf of HighRock and ESB in these transactions. *Id.* ¶¶ 84, 90, 92-94. HighRock acquired goods at one price and billed ESB for those same goods at a higher price. *Id.* ¶¶ 85-87. Monthly invoices from HighRock and Cannonbox were typically reviewed by one of Mercer's agents, including one of his accountants, Jackie Varga ("Varga"). ECF No. 43 at 5; ECF No. 44-4, ¶ 127. Ira does not dispute that these markups were not disclosed to Mercer or Varga. *Id.* ¶¶ 95-99; Tr. Oct. 30, 2023 at 119-120, 134-35.

One of HighRock's equipment vendors was Telemetrics. On multiple occasions, Ira requested and obtained from Telemetrics two invoices showing two different prices for the same goods. ECF No. 44-4, ¶¶ 108-09; Tr. Oct. 30, 2023 at 51-53. The lower invoiced amount included a 10 to 20 percent discount given by Telemetrics to HighRock. ECF No. 44-4, ¶ 116. The higher invoiced amount reflected only a 5 percent discount off the manufacturer's suggested retail price. *Id.* HighRock paid the lower invoiced price to Telemetrics, and ESB paid the higher price to HighRock. *Id.* ¶ 110. Thus, HighRock profited on these transactions. *Id.* ¶¶ 111, 113. Ira never disclosed the lower Telemetrics invoices to Mercer or Varga. *Id.* ¶¶ 105-07, 116, 130. Ira also never told Mercer that HighRock was profiting from the Telemetrics transactions. *See id.* In addition to the transactions with Telemetrics, Ira used HighRock to markup invoices provided by another third-party vendor, AJA Video Systems. With respect to AJA Video Systems, similar to the Telemetrics invoices, Ira requested and obtained two invoices for the same goods with

different prices. *Compare* Ex. 12, *with* Ex. 16, *and* Ex. 18, *with* Ex. 31. *See also* Ex. 7, 9. Ira also marked up at least one invoice from a company called Fine Quality Events, which invoiced HighRock $4,350 for services, and HighRock then invoiced ESB $12,800 for what appears to be the same services. *See* Ex. 123 (compare Bates Nos. A0000838, with A0000855).

The relationship between Ira and Mercer deteriorated after the billiards Tournament which was intended to showcase ESB's Billiards Technology. The Tournament took place in August 2018 at Mercer's home. ECF No. 43 at 8. Ira worked long hours preparing for the Tournament. *Id.* He testified at trial that he considered the lab work and Tournament planning as separate from, and in addition to, the compensation that he received in the form of a monthly salary. ECF No. 43 at 8; Tr. Oct. 30, 2023 at 133-34. Ira estimated that he was working 100 hours per week in preparation for the Tournament. ECF No. 43 at 8. Despite his long hours, apparently the Billiards Technology did not work as planned at the Tournament. ECF No. 1, ¶¶ 90-93; ECF No. 43 at 8.; Tr. Oct 31, 2023 at 21.

Following the Tournament, Mercer began to question Ira about expenses. Mercer hired an accounting firm, Citrin Cooperman ("Citrin"), in February 2019 to conduct a forensic accounting audit of ESB. ECF No. 44-4, ¶ 182; Tr. Oct. 31, 2023 at 42. When Citrin examined the books and records of HighRock, it discovered the inflated invoices and overbilling. ECF No. 44-4, ¶ 191.

## PROCEDURAL HISTORY

On April 17, 2019, Mercer sued Ira, Helen, HighRock, and Cannonbox in New York State Supreme Court, Nassau County, asserting claims for fraud, breach of fiduciary duty, and misappropriation against Ira, and for aiding and abetting fraud and aiding and abetting breach of fiduciary duty against Helen (Index No. 605310/2019, the "State Court Action"). The defendants

filed an answer, but no liability had been determined when, on March 3, 2022, Ira and Helen filed a chapter 7 bankruptcy petition in this District, thereby staying the State Court Action.

Mercer filed a proof of claim against both Debtors asserting an unliquidated claim based on the claims asserted in the State Court Action. *See* Claims Register, Proof of Claim No. 11. At present, no objection has been filed to Mercer's proof of claim.

On June 3, 2022, Mercer commenced this adversary proceeding seeking to except his debt from the Debtors' discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). The Debtors filed an answer on July 2, 2022. Answer, ECF No. 3.

On July 31, 2023, Helen moved for summary judgment on all claims asserted against her, disclaiming any involvement in, or knowledge of, Ira's dealings with Mercer and/or ESB. Mot. Summ. J., ECF No. 18. The Court denied the motion for summary judgment by Order, dated September 8, 2023. Order, ECF No. 27.

The Court conducted a trial of this matter over 3 days – October 30, October 31, and November 1, 2023 – solely on the issue of the non-dischargeability of Debtors' debt to Mercer. Determination of the dollar amount of that debt was deferred.

At trial, Ira, Helen and Mercer all testified. Mercer presented expert witness testimony by a forensic accountant, Joseph Lesowitz, from the Citrin accounting firm. He also presented testimony by Telemetrics representative, Anthony Cuomo. The following Plaintiff's exhibits were stipulated to in the Pre-Trial Memorandum: #s 1 - 90, 106, 107, 112 – 115, 117 – 131, 133-141. *See* ECF No. 31-2. The following Plaintiff's exhibits were admitted at trial: #s 108 - 111, 116. The Defendants' exhibits F, G, and J (in part) were admitted at trial.

## DISCUSSION

Mercer has asserted a claim against the Debtors for payments he and/or ESB made to Ira and/or HighRock and Cannonbox which Mercer alleges constituted improper profits and wages taken at Mercer's and/or ESB's expense. Specifically, during the Pre-ESB Period, Mercer, individually, is seeking to recover from the Debtors: (a) the amounts Mercer paid to HighRock for goods that cannot be reconciled to payments HighRock made for those same goods (*i.e.*, HighRock's profit), and (b) the amounts Mercer paid to Ira through Cannonbox for Ira's services. As to (a), above, Mercer argues that during the Pre-ESB Period, Ira owed Mercer a fiduciary duty which Ira breached when he caused HighRock to charge undisclosed markups on products. ECF No. 1, Ex. 1 ("State Court Complaint"), ¶¶ 169-172.[5] Mercer also alleges that Ira's practice of charging Mercer markups in the Pre-ESB Period constituted fraud. As to (b), above, as a byproduct of Ira's alleged breach of fiduciary duty and fraud, Mercer seeks to recover from Ira the salary that Mercer paid him in the Pre-ESB Period and declare that amount non-dischargeable.[6]

---

[5]     Mercer alleges in the State Court Action that "Prior to ESB's formation, Lee acted as Mercer's agent for handling the Billiards Inventions and other projects. . . . In the alternative, Lee and Mercer were partners in pursuing the Billiards Inventions. . . . As Mercer's agent and/or partner, Lee owed fiduciary duties to Mercer, which include a duty of undivided loyalty, such that Lee was not permitted to utilize his position as Mercer's agent or partner to secure undisclosed benefits for himself. Lee also owed Mercer a duty of candor, which required him to speak honestly about all facts that were material to their relationship." State Court Complaint, ¶¶ 169-172. Mercer alleges that Lee violated these duties by charging markups on the HighRock products. He also alleges that by abusing his position as Mercer's agent and taking secret profits on top of his compensation Lee "acted adversely to Mercer, which amounts to fraud upon Mercer as Lee's principal." *Id*. ¶ 174; *see Selwyn & Co. v. Waller*, 212 N.Y. 507, 511 (1914) (secret profits).

[6]     The § 523 Complaint alleges: "Mercer paid a salary to Mr. Lee of at least approximately $350,000 for a period of less than two years with the understanding that Mr. Lee would work diligently and be honest and straightforward about, among other things, the costs actually incurred and subsequently paid for by Mercer." ECF No. 1, ¶ 10.

During the ESB Period, Mercer is seeking to recover, derivatively as 50 percent shareholder of ESB: (1) the amount by which HighRock marked up goods sold to ESB; (2) the discrepancy between amounts Cannonbox billed to ESB and the amounts Cannonbox actually paid to third party contractors; and (3) payments made to Ira by ESB for serving as ESB's President because Ira owed a fiduciary duty to ESB and did not fulfill that duty. These claims were all asserted in the State Court Action and are yet unliquidated. However, they will be the basis for this Court's § 523(a) analysis.[7]

As previously stated, Ira does not dispute that Mercer has established a debt for purposes of this § 523 analysis. ECF No. 43 at 13. Also, Ira has not, at any time in these proceedings, argued that he did not owe a fiduciary duty to Mercer and/or ESB. For purposes of this analysis, the Court finds Ira owes Mercer a debt, and owed Mercer and ESB the duties of a fiduciary. *See, e.g.*, *Schachter v. Kulik,* 466 N.Y.S.2d 444, 446 (N.Y. App. Div. 1983) ("Directors and officers, in the performance of their duties, stand in a fiduciary relationship to their corporation… they owe the corporation their undivided loyalty and are not permitted to derive a personal profit at the expense of the corporation.") (citations omitted); *Meinhard v. Salmon*, 249 N.Y. 458, 462 (1928) (finding co-adventurers owe each other fiduciary duties).

Ira disputes the amount of the debt. He also disputes that the debt is non-dischargeable. ECF No. 43 at 6, 16. Ira's primary argument is that even when marked up, the amount that was invoiced to ESB and/or Mercer reflected a fair price for the goods and services provided, and if ESB/Mercer paid a fair price, then they were not defrauded. ECF No. 43 at 2.

---

[7]    This Court is not being asked at this time to allow or disallow Mercer's claim - only to determine whether it is non-dischargeable.

The Court must determine whether Mercer's allegations were proven at trial and whether they give rise to a non-dischargeable debt. This Court is mindful that exceptions to discharge are to be construed narrowly, and the plaintiff must prove its claims by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007) (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)).

## 1. *Non-dischargeability against Ira*

Mercer contends his claims against Ira fall within three non-dischargeability grounds provided by the Bankruptcy Code. First, Mercer argues that Ira obtained money from Mercer by "false pretenses, a false representation, or actual fraud" under § 523(a)(2)(A). Second, he argues Ira's debt to Mercer is for "fraud or defalcation while acting in a fiduciary capacity" under § 523(a)(4).[8] Third, Mercer maintains that Ira's conduct that gave rise to the debt constitutes "willful and malicious" injury to Mercer under § 523(a)(6). The Court will address each in turn.

### a. *11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides that a debt is non-dischargeable where the debt is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). These three grounds present three distinct concepts. Only one need be proven to prevail. *See Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002) (emphasizing that the statute's use of the subjunctive "or" demonstrates the existence of three distinct grounds). Thus, the Court will evaluate each theory separately.

---

[8]    Mercer generally alleges non-dischargeability under § 523(a)(4). Although he quotes the entire subsection, including embezzlement and larceny, as grounds, Mercer does not specifically allege that Ira committed embezzlement or larceny, so this Court addresses only whether Ira's actions constituted fraud or defalcation while acting in a fiduciary capacity.

### i. False Pretenses

Generally speaking, a cause of action for false pretenses involves an implied misrepresentation or conduct intended to create and foster a false impression, or a conscious deception and concealment of material information. *See Am. Honda Fin. Corp. v. Ippolito (In re Ippolito)*, Bankr. Case No. 12-70632-ast, Adv. No. 12-70632-ast, 2013 WL 828316, at *6 (Bankr. E.D.N.Y. March 6, 2013); *Rescuecom Corp. v. Khafaga (In re Khafaga)*, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009) (citations omitted). Specifically, to establish this claim a plaintiff must prove that the defendant (1) made an omission or implied misrepresentation, (2) promoted knowingly and willingly, (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff, (4) which wrongfully induced the plaintiff to advance money, property, or credit to the defendant. *See Voyatzoglou et al. v. Hambley (In re Hambley)*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005) (citing *Sandak*, 287 B.R. at 12). "[W]here a duty to disclose exists, silence may constitute false pretenses." *Ippolito*, 2013 WL 828316, at *6 (citing *In re Behnam*, 2005 Bankr. LEXIS 435, at *20-21 (Bankr. E.D.N.Y. March 17, 2005)).

Ira argues that Mercer, at all times, was aware that both HighRock and Cannonbox were for-profit entities, and he should have expected that there would be a profit built into the invoices. *See* Tr. Oct. 30, 2023 at 104-05; Tr. Oct. 31, 2023 at 15-16, 18. He also contends that he merely remained silent about the markups rather than making affirmative misrepresentations.

The Court finds that Mercer has satisfied his burden with respect to the false pretenses cause of action under § 523(a)(2)(A) by showing that Ira knowingly and willingly made omissions or implied misrepresentations which created a contrived and misleading understanding of the actual cost of goods and services provided to Mercer and ESB, and this was done to induce Mercer to continue to advance funds. First, the Court finds that Ira made an implied

misrepresentation each time he submitted an invoice to Mercer or his accountant for payment where that invoice did not reflect the true price that HighRock paid for goods, including but not limited to, goods from Telemetrics. *See Giglio v. Nisivoccia (In re Nisivoccia)*, 502 B.R. 139, 157 (Bankr. E.D.N.Y. 2013). In an ordinary, arms-length commercial transaction to provide goods and services, parties might presume a profit margin by the seller. However, the facts of this case do not present ordinary, arms-length commercial transactions. Here, there was a fiduciary relationship between the parties which imposed duties upon Ira, including a duty to disclose. *See Birnbaum v. Birnbaum*, 539 N.Y.S.2d 574, 576 (1989). Silence can constitute false pretenses where there was a duty to disclose the material facts. *See, e.g.*, *Reddy v. Melnik* (*In re Melnick),* 592 B.R. 9, 22 (Bankr. N.D.N.Y. 2018) ("False pretenses, therefore, may be based on an implied misrepresentation or silence in the face of a duty to disclose material facts on which a transaction depends."). As a fiduciary, Ira had a duty to disclose the material facts of his billing practices, and the Court finds that his failure to do so constituted omissions or implied misrepresentations.

Ira cites to this Court's decision in *Giglio v. Nisivoccia (In re Nisivoccia)*, 502 B.R. 139 (Bankr. E.D.N.Y. 2013), to support his case. In *Nisivoccia,* this Court found that the debtor made implied representations as to the cost of goods sold to a client when the debtor forwarded inflated invoices on third party letterhead to the client. *Id.* at 154. Ira distinguishes *Nisivoccia* by arguing that the debtor in that case specifically represented to the client that any discounts she received would be passed on to the client. ECF No. 43 at 14. Here, Ira argues, he did not enter into any such express agreement with Mercer or ESB that required HighRock to provide ESB with any discounts that HighRock received from Telemetrics, or any other supplier. *Id.*

It is true that in *Nisivoccia*, there was an express agreement which created an obligation on the debtor to pass on discounts to the client. It is also true that there is no such express agreement in the instant case. Although not created by express agreement, in the case at bar, Ira still had an obligation of full disclosure, which was created by the fiduciary relationship between the parties. Ira and Mercer were shareholders in a closely-held entity, and before that, they were engaged in a joint enterprise. The parties in *Nisivoccia* were engaged in an arms-length commercial transaction, so the agreement imposed an obligation that ordinarily would not have existed. Like the agreement to pass on discounts in *Nisivoccia,* the fiduciary duty that Ira owed to Mercer created an obligation to inform Mercer of the markups. Therefore, Ira's attempt to distinguish *Nisivoccia* fails.

Second, Ira has never denied that the markups were charged to Mercer knowingly and willingly, and the record in this case supports a finding that that they were charged knowingly and willingly. Third, the Court finds that the markups created a misleading understanding of the transactions on Mercer's part. Ira's own testimony supports this finding. According to Ira, the markups to ESB were intended to effectively pay for the integration work, and his long hours that were not otherwise compensated, and so value was provided to Mercer in the markups. ECF No. 43 at 14; *see* Tr. Oct. 30, 2023 at 133-34.[9] Ira felt justified in charging the markups, but in doing so, he created a "contrived and misleading" understanding of the transactions. Fourth, the Court finds that Ira's conduct cited above wrongfully induced Mercer to continue funding the billiards project. Mercer's unrefuted testimony is that if he had known the truth about Ira's

---

[9]    Ira claims that the $40,000 per month salary he was paid during the ESB Period was premised on a 40-hour work week but in actuality, he was typically working 60-70 hours per week. ECF No. 43 at 5; Tr. Oct. 30, 2023 at 153.

billing practices, he would not have continued to fund the project. Tr. Oct. 31, 2023 at 13-14, 38-39.

Thus, Mercer has established a false pretenses claim under § 523(a)(2)(A), and the Court finds that Ira's liability to Mercer, if any, is non-dischargeable under that provision.

### ii.   False Representations

To show a false representation under § 523(a)(2)(A), a plaintiff must demonstrate by a preponderance of the evidence that (1) the debtor made a false or misleading statement, either written or oral, (2) with the intent to deceive, (3) in order for the plaintiff to turn over money or property to the debtor. *See In re Ippolito*, 2013 WL 828316, at *5. The false representation can be established through not only an express statement but also an omission where the circumstances are such that disclosure is necessary to correct what would otherwise create a false impression, regardless of whether the debtor subjectively believed the omitted facts were material. *See Parklex Assocs. v. Deutsch (In re Deutsch)*, 575 B.R. 590 (Bankr. S.D.N.Y. 2017) (involving a debtor who told partners about a sale but did not share that the sale gave him certain tax benefits).

The Court finds that Ira made multiple false or misleading written statements to Mercer and ESB each time he submitted invoices to Mercer for payment representing the cost of the goods and services being procured on behalf of Mercer and ESB. The second element, intent to deceive, may be "established through circumstantial evidence and inferred from the totality of the evidence presented." *See, e.g.*, *Voyatzoglou et al. v. Hambley (In re Hambley)*, 329 B.R. 382, 397 (Bankr. E.D.N.Y. 2005); *Citibank (South Dakota), N.A. et al. v. Senty (In re Senty)*, 42 B.R. 456, 459 (Bankr. S.D.N.Y. 1984). Ira claims that it was never his intention to deceive Mercer. Instead, Ira claims that at all times Mercer knew HighRock was a for-profit enterprise, and

therefore, he should have known that HighRock would profit from these sales. *See* Tr. Oct 30, 2023 at 104-05. However, Ira's argument is belied by his intentional procurement, on multiple occasions, of two sets of invoices from Telemetrics and AJA Video Systems for the purpose of presenting the higher priced invoice to Mercer for payment. *Compare* Ex. 12, *with* Ex. 16, *and* Ex. 18, *with* 31. *See also* Ex. 7, 9. *See Selwyn & Co. v. Waller*, 212 N.Y. 507, 511 (1914) ("The very fact that one conceals his true interest from the other indicates a purpose to gain some advantage at the other's expense, or a belief that disclosure would influence the other in deciding whether and upon what terms to embark on the enterprise."). If Ira believed it was so evident to Mercer that HighRock would be charging a markup, there would be no need to obtain a second set of higher invoices. Ira's testimony on this point is not credible.

Ira's other justification for charging the markups is that they represented an "integration fee," specifically with respect to the Telemetrics products. Tr. Oct. 30, 2023 at 81-82. According to Ira, only HighRock, not Mercer or ESB, was entitled to the 10 to 20 percent Telemetrics discount because HighRock was a "dealer/integrator" as opposed to an "end user," like ESB. ECF No. 44-4, ¶ 117; Tr. Oct. 30, 2023 at 82-83. Ira claims that a substantial amount of additional integration work was required with respect to the products purchased from Telemetrics, and he spent "countless" hours preparing the technology for the tournament, earning him the markup. ECF No. 43 at 7. Ira admits he made a mistake in not disclosing HighRock's integration discount to Mercer, but it was not his intention to deceive Mercer. ECF No. 43 at 7. Ira says that if Mercer had asked, he would have disclosed the markup. In any event, Ira argues, the Telemetrics markups were insignificant in the context of this case because the total markup for the Telemetrics invoices was $139,462, which represents less than 1 percent of the more than $10 million contributed to ESB by Mercer. ECF No. 43 at 8.

Ira's attempts to justify these overcharges fail. First, Telemetrics stated in writing that HighRock was not prohibited from passing on the "integrator" discount to ESB as end user. Tr. Oct. 30, 2023 at 81-85; Ex. 71; *see also* Ex. 54, 61. Second, Ira's concession at trial that, by not passing on the discount to ESB, he was charging ESB for additional work that he did not believe his $40,000 salary compensated him for, undermines his argument that Telemetrics policy prevented him from passing on the discount. Tr. Oct. 30, 2023 at 37-39, 133-35. The testimony and evidence presented at trial lead this Court to conclude that Ira did not feel that the salary being paid to him was sufficient to compensate him for the long hours he was working on projects for ESB and Mercer; and so, this Court believes Ira contrived a scheme to overbill Mercer and ESB for goods to make up for the shortfall in his compensation. *See, e.g.*, Tr. Oct. 30, 2023 at 81-82. This self-help and self-dealing was contrary to Ira's fiduciary obligations and clearly shows an intent to deceive Mercer. Finally, Ira's argument that a $139,462 markup is insignificant in the context of this case is without merit. It is only one element of the allegations here, and it is far from *de minimis*.

The Court finds Ira's use of Cannonbox as an intermediary to bill Mercer and ESB for services is further evidence of his intent to deceive. Ira has presented no legitimate business reason for doing so. *See* Tr. Oct. 30, 2023 at 37-39. He claims he used Cannonbox as an intermediary between ESB and the third-party contractors because those contractors did not want to work directly for Mercer, or ESB, a company associated with Mercer, for political reasons. Tr. Oct. 30, 2023 at 38. Ira failed to introduce at trial any affidavit, third party testimony, or other evidence to support this claim. The Court finds Ira's excuse for billing through Cannonbox to be implausible and that it is more likely that Ira billed Mercer through Cannonbox to inflate the cost of his and others' services and to deceive Mercer as to the actual cost of services provided.

Further evidence of Ira's intent to deceive Mercer is found in his billing ESB, through Cannonbox, for bookkeeping services purportedly provided by Helen. From in or around March 2016 through December 2016, Ira submitted to ESB monthly Cannonbox invoices for bookkeeping services by Helen which totaled approximately $32,000. *See* Ex. 4, 6. Both Ira and Helen testified that she did not provide those services. When Ira was questioned about this at trial, he explained: "[O]ften we just needed funding so that we can pay for stuff to get done. . . . I put in the budget part of it as the intention of a budget request, so that we'd have the funding, so I can hire somebody to do that. . . . These were budget items in my mind, listed so that we can get the funding to be able to operate." Tr. Oct. 30, 2023 at 35- 36. Ira said it was his intention that Helen would help him with bookkeeping, but she never did. *Id.* at 35. Ira testified that he provided the bookkeeping services, and he did not feel right about charging ESB his engineering rate. *Id.* At best, Ira's testimony confirms that he was overbilling ESB in some areas to make up for shortfalls in his agreed compensation. At worst, Ira was submitting false invoices to extract additional funds from Mercer. Either way, it shows that he intended to deceive Mercer and ESB.

As for the final element, the Court finds that the invoices Ira provided to Mercer and ESB were intended to, and did, cause Mercer to provide funds to ESB to, in turn, pay the HighRock and Cannonbox invoices, all to Ira's ultimate benefit.[10]

Thus, Mercer has established his false representation claim under § 523(a)(2)(A), and the Court finds that Ira's liability to Mercer, if any, is non-dischargeable under that provision.

---

[10]    At trial, Ira initially denied receiving profit distributions from HighRock between 2014 and 2019. Tr. Oct. 30, 2023 at 21-22. However, counsel introduced his previous deposition testimony in which Ira stated that he wrote checks to himself from the HighRock account. Ira agreed that these deposition statements were true and that he did not understand the check writing to be the receiving of profit distributions. *Id.* Ira subsequently admitted that he received profit distributions from CannonBox during this same time period. *Id.*

### iii.   Actual Fraud

To establish actual fraud under § 523(a)(2)(A), a plaintiff generally must establish: "(1) that the defendant made a false representation, (2) the defendant knew that it was false at the time that it was made, (3) the defendant made the representation with the intention of deceiving the plaintiff, (4) that the plaintiff justifiably relied on the representation, and (5) that the plaintiff sustained damages that were proximately caused by the false material representation." *In re Ippolito*, 2013 WL 828316, at *6. However, as made clear by the Supreme Court in *Husky Intern. Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016), actual fraud can be established under § 523(a)(2)(A) without proving a false representation. Rather, actual fraud can be established by a fraudulent scheme. *Id.* at 359.

The Court has already found that Ira made multiple false representations to Mercer, Ira knew that the representations were false, and it was Ira's intention to deceive Mercer. Therefore, the first three elements of the actual fraud claim are satisfied. The fourth element is justifiable reliance. *See Field v. Mans*, 516 U.S. 59 (1995). Mercer testified that if he had known Ira/Cannonbox were billing ESB for amounts that could not be reconciled to payments to third party contractors, he would not have continued to make payments to Cannonbox or fund ESB projects, nor would he have paid Ira $1,655,000 in compensation. ECF No. 44-4, ¶¶ 201-02; Tr. Oct 31, 2023 at 13-14; *see* Ex. 111-114 (comparing amounts paid to Cannonbox by ESB to amounts paid by Cannonbox to contractors, with supporting documentation). Mercer also testified that if he had known Ira was marking up HighRock's invoices, he would not have continued to do business with Ira. ECF No. 44-4, ¶ 197; Tr. Oct. 31, 2023 at 38-39.

Ira argues that the markups were discoverable by Mercer, and if discovered and questioned, he would have made a full disclosure. ECF No. 43 at 4-5; Tr. Oct 30, 2023 at 119-

120. However, Ira cannot rely on Mercer's and/or Varga's review of all invoices to defeat the justifiable reliance element. Under the standard set forth by the Supreme Court in *Field v. Mans*, justifiable reliance does not require an investigation by the plaintiff beyond a cursory review unless the plaintiff "has discovered something which should serve as a warning that he is being deceived . . ." 516 U.S. at 71. As stated above, the nature of Mercer and Ira's relationship was a fiduciary one in which Ira had a duty to act in the best interests of both ESB and Mercer. Mercer relied on Ira in his role as President of ESB to uphold his attendant fiduciary duties, and there was nothing that put Mercer on notice that the invoices were deceptive. The Court finds that Mercer was justified in believing that the invoices presented to him were accurate representations of actual cost. For these reasons, the Court is not persuaded by the argument that Mercer or Varga's failure to investigate prevents a finding of fraud under § 523(a)(2)(A).

The final element of the actual fraud claim is damages. Ira disputes the amount of damages and argues that, whether marked up or not, every invoice that HighRock and Cannonbox via HighRock submitted to ESB reflected a fair price for the goods and services provided and if ESB paid a fair price, then neither ESB nor Mercer were damaged. ECF No. 43 at 2. Although Ira disputes the amount of the damages, he has conceded that Mercer established a debt for purposes of this § 523(a)(2)(A) analysis. Therefore, without deciding the amount of the damages, the Court finds that this element of the actual fraud claim is satisfied for purposes of this analysis.

Thus, Mercer has established his actual fraud claim under § 523(a)(2)(A) and the Court finds that Ira's liability to Mercer, if any, is non-dischargeable under that provision.

  *b. 11 U.S.C. § 523(a)(4)*

   Pursuant to § 523(a)(4) debts arising from a debtor's fraud or defalcation while acting in a fiduciary capacity are non-dischargeable. The Court finds that Mercer has established this claim. First, Ira has not disputed that he owed Mercer and ESB a fiduciary duty, and this Court has already found that such a duty existed. Second, the Court finds that Ira was acting within the context of this fiduciary relationship at all times relevant to this Decision. Finally, this Court has already found that Ira committed fraud as to Mercer and ESB for purposes of the § 523(a)(2)(A) claim, and these findings apply equally to the fraud element of § 523(a)(4). *See* actual fraud discussion *supra* Section 1(a)(iii).

   Thus, Mercer has established the § 523(a)(4) claim, and the Court finds that Ira's liability to Mercer, if any, is non-dischargeable under that provision.

  *c. 11 U.S.C. § 523(a)(6)*

   Section 523(a)(6) excepts from discharge debts arising from "willful and malicious injury by the debtor to another entity or property of another entity…" 11 U.S.C. § 523(a)(6). A willful and malicious injury requires proof of "deliberate or intentional injury" rather than a merely deliberate or intentional act that happens to lead to an injury. *Kawaahua v. Geiger*, 523 U.S. 57, 61 (1998). As for the malice element, "in cases where a debtor seeks profit or some other benefit, 'the underlying conduct, however deplorable, would not give rise to liability under § 523(a)(6) in the absence of some additional, aggravating conduct on the part of the debtor of sufficient gravity to warrant an inference of actual malice under the Second Circuit decision in [*Navistar v. Stelluti (In re Stelluti)*, 94 F.3d 84 (2d Cir. 1996)].'" *Rescuecom Corp. v. Khafaga (In re Khafaga)*, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009) (quoting *Novartis Corp. v. Luppino (In re*

*Luppino)*, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)); *Bundy Am. Corp. v. Blankfort (In re Blankfort),* 217 B.R. 138, 145 (Bankr. S.D.N.Y. 1998).

The Court finds that the "willful" element of § 523(a)(6) has been satisfied. Clearly, Ira's actions were deliberate and intentional, *i.e.*, willful. In fact, Ira's testimony confirms that his actions were deliberate. However, the record does not support a finding of aggravating circumstances sufficient to impute malice to Ira's actions. The record reflects that Ira's actions were motivated by his desire to secretly extract additional compensation from Mercer to which he believed he was entitled. Without more, this does not constitute malice.

Mercer's claim against Ira under § 523(a)(6) will be dismissed.

### 2. *Non-dischargeability against Helen*

Mercer alleges that Helen was involved in Ira's fraud and breach of fiduciary duty and benefited from it in the form of profit distributions from both HighRock and Cannonbox.[11] ECF No. 44-1 at 4. As such, Mercer alleges that Helen is also liable to him and that liability should be excepted from discharge under the Supreme Court precedent in *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023). To prove Helen's involvement in Ira's fraud, Mercer alleges the following:

- Helen is HighRock's sole owner and President with check-writing authority and access to its bank accounts. ECF No. 44-4, ¶ 159;
- Helen was aware that HighRock was doing business with, and selling goods to, ESB. *Id.* ¶¶ 168-69;
- During the time that HighRock sold goods to ESB, Helen received profit distributions from HighRock. *Id.* ¶ 170;
- Helen met Mercer on three occasions. *Id.* ¶ 165;
- Helen received payments from CannonBox for bookkeeping services allegedly performed by her for ESB. *Id.* ¶ 176;
- Based on the foregoing, Helen knew or should have known that HighRock was improperly marking up invoices and overcharging ESB. *Id.* ¶ 180.

---

[11]    Helen testified at trial that she did not know whether she received profit distributions from HighRock because her husband handles all of the financial matters. Tr. Oct. 30, 2023 at 164-65.

Helen disclaims any involvement in, or awareness of, the business dealings between Cannonbox/HighRock and ESB or the manner in which Ira billed ESB on behalf of those entities. ECF No. 43 at 16; Tr. Oct. 30, 2023 at 173-76. Helen argues that, although she was the titular owner of HighRock, she was no longer involved with HighRock or any of its operations in 2012 when Ira met Mercer, and Mercer has neither alleged nor proven any specific acts taken by her in connection with this case. ECF No. 43 at 2; Tr. Oct. 30, 2023 at 173-76. Nor did she perform any services for Cannonbox. ECF No. 43 at 2; Tr. Oct. 30, 2023 at 48-49, 179.  Finally, she argues that the facts of this case do not warrant a finding of non-dischargeability under *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023).

The Court will first address the issue of imputation under *Bartenwerfer v. Buckley*. In that case, the debtors were spouses and business partners, who were both found liable for breach of contract, negligence, and non-disclosure of material facts in a pre-petition judgment under California law based on the failure to disclose material facts relating to a real property transaction. *Id.* at 69-72. The debtors filed bankruptcy and sought to discharge this liability. *Id.* In a § 523(a) non-dischargeability action brought by the judgment creditor, the debtors argued that the judgment arose from the actions of the debtor/husband alone, and the debtor/wife had no knowledge of her husband's wrongful conduct. *Id.* The Supreme Court found that the existence of the wife's liability for her husband and business partner's bad acts under California law was sufficient to sustain a finding of non-dischargeability under § 523(a) because the statute only requires that the debtor have been held liable for fraud, regardless of her own culpability. *Id.* "[I]nnocent people are sometimes held liable for fraud they did not personally commit, and, if they declare bankruptcy, § 523(a)(2)(A) bars discharge of that debt." *Id.* at 83. Conversely, if the

innocent partner is not liable for the fraud under state law, "§ 523(a)(2)(A) would have no role to play." *Id.* at 82.

In *Bartenwerfer v. Buckley*, the liability had already been found by a pre-petition judgment. Here, we have no such finding, and this Court is not prepared to make such a finding based on the record in this case. Although New York State law provides liability for the acts of partners in a partnership, *see* N.Y. P'ship Law § 26, there was no legal partnership agreement between Ira and Helen. Rather, Helen owned the corporation, and Ira was acting as agent for the corporation. New York State law provides that 100 percent shareholders are not subject to vicarious liability for the torts of a corporation's agents or employees. *See Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163 (1980) ("As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and…will not impose liability upon shareholders for the acts of the corporation."). Absent proof of Helen's knowing participation in Ira's wrongdoing, the Court will not impute Ira's bad acts to Helen under *Bartenwerfer v. Buckley*.

Mercer argues that imputation remains appropriate because a partnership requires only that two or more people carry on a business and share in profits regardless of other agreements characterizing the relationship differently. ECF No. 44-1 at 44. However, under New York State law, a partnership may not exist where a business is conducted as a corporation. *See Weiner v. Hoffinger, Friedland, Dobrish, & Stern, P.C.*, 749 N.Y.S.2d 255, 256 (N.Y. App. Div. 2002); *Berke v. Hamby*, 719 N.Y.S.2d 280, 280 (N.Y. App. Div. 2001). For these reasons, *Bartenwerfer* imputation is inappropriate in this case.

The facts proven at trial as to Helen's involvement in Ira's actions are sparse. Mercer's allegations as to Helen's involvement largely hinge on Helen's ownership of HighRock, and

thus, her *ability* to take action on HighRock's behalf, as opposed to her actually performing the actions complained of here. Ira and Helen both testified that Ira controlled all of HighRock's daily operations, and this was not refuted by Mercer. Tr. Oct. 30, 2023 at 21, 175. Mercer's specific allegations as to her involvement are refuted by the record. Mercer alleges Helen provided bookkeeping services for ESB through Cannonbox and was paid approximately $32,000 via check, which she deposited into the Debtors' joint bank account. Ex. 4, 6. At trial, Helen testified that she did not provide any bookkeeping services to ESB, or any other party, through Cannonbox, and she did not endorse the checks that were written to her as compensation. Tr. Oct 30, 2023 at 181-84, 189. As previously discussed, Ira testified that Helen did not provide bookkeeping services to ESB, and he forged his wife's signature on the checks that were written to her name. Tr. Oct. 30, 2023 at 44. The record does not reflect any affirmative act by Helen that could support a finding of non-dischargeability under any subsection of § 523(a). Absent that, or a pre-established liability for wrongdoing, Mercer has failed to establish a § 523(a) claim against Helen and Mercer's claims against her under § 523(a) will be dismissed.

## **CONCLUSION**

For the foregoing reasons, this Court finds that: (a) the Debtor, Ira Lee's debt to Mercer, both individually and derivatively as shareholder of ESB, is non-dischargeable under §§ 523(a)(2)(A) and (a)(4); (b) Mercer's claim against Ira under § 523(a)(6) shall be dismissed; and (c) all of Mercer's claims under § 523(a) against the Debtor, Helen Lee, are dismissed. This holding concerns only Mercer's § 523(a) claims. This Decision is in no way a determination of the allowance or disallowance of Mercer's proof of claim, nor does it determine damages.

Mercer is directed to submit a proposed judgment consistent with this Decision within seven (7) days of entry of this Decision. This matter is restored to the Court's calendar for a further pre-trial conference on April 29, 2024 at 9:30 a.m., in Courtroom 860, United States Bankruptcy Court, 290 Federal Plaza, Central Islip, NY.



Dated: Central Islip, New York
March 25, 2024

Robert E. Grossman
United States Bankruptcy Judge