UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                                    Case No.: 22-70367-reg

Ira Lee and Helen Koh Lee,                                  Chapter 7
                                    Debtors.
-------------------------------------------------------- x
Robert L. Mercer,
individually and derivatively
as a Shareholder of ESB Labs, Inc.,

                                    Plaintiff,                         Adv. Pro. No.: 22-08045-reg

             -against-

Ira Lee and Helen Koh Lee,
                                    Defendants.
--------------------------------------------------------x

## DECISION AFTER TRIAL ON DAMAGES

On March 25, 2024, this Court issued a Decision finding the Debtor, Ira Lee's ("Ira"),

debt to the Plaintiff, Robert L. Mercer, individually and derivatively as a Shareholder of ESB

Labs, Inc. ("Mercer"), non-dischargeable under § 523(a)(2)(A) and (a)(4) based on Ira's breach

of fiduciary duty and fraud against Mercer. ECF 45[1]; *Mercer v. Lee (In re Lee)*, 2024 WL

1261790 (Bankr. E.D.N.Y., Mar. 25, 2024). The matter currently before the Court concerns the

determination of the precise dollar amount of that debt. Mercer is seeking to recover a total of

$2,313,998 in alleged damages suffered due to Ira's fraud and breach of fiduciary duty. He also

seeks to recover a total of $607,551.51 for his attorney's fees, expert fees and costs for

prosecuting this action which is partly derivative in nature. ECF 74.

---

[1]          Unless otherwise noted all ECF references in this Decision are to the docket in Adv. Proc. No. 22-
8045.

A summary of the business relationship among the parties is helpful to understand how Mercer calculated damages. Mercer funded a business arrangement he had with Ira – at first informal, then formalized through the creation of ESB Labs, Inc. ("ESB") – to promote the game of three-cushion billiards in the United States. Mercer contributed substantial funds to this endeavor – approximately $10 million in total – and Ira provided the billiards and technological expertise. Mercer advanced funds based on invoices for goods and services issued to him and later ESB by Ira through Ira's companies, HighRock, Inc. ("HighRock") and Cannonbox, Inc. ("Cannonbox"). By all accounts, it was Ira's decision to use HighRock and Cannonbox as intermediaries between goods and service providers ("Vendors"), on the one hand, and Mercer and ESB on the other. Mercer claims that Ira, through HighRock and Cannonbox, overcharged him and ESB. A forensic accountant hired by Mercer after the business relationship soured tracked payments made by Mercer and ESB to HighRock and Cannonbox based on specific invoices and compared those amounts to payments actually made by HighRock and Cannonbox to Vendors. The forensic accountant found "unreconciled disbursements" and "inappropriate transactions" which, according to Mercer, created significant differences between the amount Mercer and ESB paid into the endeavor and the amount that HighRock and Cannonbox actually paid to Vendors. In his defense, Ira offers explanations for nearly every billing discrepancy and argues that in fact HighRock and Cannonbox paid more to Vendors than Mercer contributed to the venture. Where Ira cannot refute an alleged overcharge, he argues that he was entitled to it as compensation for his services, or that the overcharge was so slight it should be forgiven.

As previously stated, this Court already found Ira breached his fiduciary duty to and committed fraud against Mercer and ESB. Today's Decision examines in detail Ira's carefully orchestrated plan to defraud Mercer. The facts of this case are somewhat complicated and

required the Court to review accounting records and financial information for a number of companies. While the facts are complicated the fraud is neither complicated nor novel. Ira, while gaining the trust of Mercer and in fact becoming Mercer's partner in the business, utilized that position to enrich himself to the detriment of his partner. Despite Ira's protestations that he had no intent to defraud Mercer the facts clearly prove otherwise. Ira chose to conduct himself in a certain way in relationship to Mercer and ESB. Poor bookkeeping skills are not, in this Court's view, a defense to damages for fraud and breach of fiduciary duty and Ira should not be permitted to hide behind that excuse now.

This Court finds that Ira is liable to Mercer, individually and derivatively, in the total amount of $2,293,539.42. Mercer shall have a direct claim against Ira in the amount of $704,386, and a derivative claim in the amount of $1,589,153.42. This represents a reduction of $20,458.58 in the damages awarded to Mercer derivatively as a shareholder of ESB.[2] The Court further finds that Mercer is entitled to recover $419,210.19 in attorney's and expert fees and costs out of any amounts collected by ESB from Ira.

## FACTUAL BACKGROUND

Ira has a background in computer science and specializes in billiard and three-cushion billiard technology. ECF 44-4, ¶¶ 1, 3. Ira is the president of HighRock of which his wife, Helen Lee ("Helen"), is the sole owner. *Id.* ¶¶ 6-7. Ira is the sole owner of Cannonbox. *Id.* ¶¶ 19-20.

---

[2]    As explained in detail later in this Decision, the $20,458.58 reduction is for the following items of alleged "inappropriate transactions" in the ESB Period: $2,669.58 re: Road Cases USA; $5,376 re: Verendus; $5,573 re: The Systems Group; $840 re: Visions Research; and $6,000 re: "unsupported" disbursement.

Mercer is a well-known investor and public figure who has a special interest in promoting the game of billiards in the United States. ECF 1, ¶ 8.

Ira and Mercer met in or about 2012 when Ira provided Mercer with three-cushion billiards lessons. ECF 44-4, ¶ 30. Their common interest in billiards led them to conduct business together, funded entirely by Mercer, to develop billiards-related technologies. *Id.* ¶ 32. Ira provided goods and services to Mercer for billiards-related projects. *Id.* ¶¶ 34, 35. He reported his progress and billed Mercer through HighRock. *Id.* ¶¶ 34-37. This arrangement began on or around July 14, 2014 and ended on or about March 31, 2016 (the "Pre-ESB Period"). *Id.* ¶ 39. There was no written agreement between Ira and Mercer defining their business relationship during the Pre-ESB Period. It is undisputed that during the Pre-ESB Period HighRock obtained goods at one price and resold them to Mercer at a higher price without notifying Mercer of the markup. *Id.* ¶¶ 43-44.

The Pre-ESB Period concluded in or around February 2016 when the parties formed ESB, an entity owned by Mercer and Ira in equal shares. ECF 44-4, ¶¶ 25-26. The business objective that existed between Ira and Mercer in the Pre-ESB Period continued, except Mercer's funding was provided to ESB, and ESB paid invoices from HighRock and Cannonbox. Tr. Oct. 30, 2023 at 37-38.[3] Similar to the Pre-ESB Period, Mercer was ESB's sole funding source. ECF 44-4, ¶¶ 60. Mercer funded ESB through loans and capital contributions and thus Mercer is ESB's 50% owner and a creditor. *Id.* ¶ 61-62. (The period from February 2016 through early 2019 is referred to herein as the "ESB Period").

---

[3]    The docket in this adversary proceeding contains two different transcripts of the October 30, 2023 hearing. ECF 37, 41. The Court's references in this Decision are to the transcript at ECF 37.

During the ESB Period, Ira billed ESB $40,000 per month through Cannonbox for his own services for research and development work. ECF 44-4, ¶ 150. During the ESB Period, HighRock billed ESB at a markup for goods and services. *Id.* ¶¶ 82, 85-87, 95-99. Ira admits that these markups were not disclosed to Mercer. Tr. Oct. 30, 2023 at 119-20, 134-35.

The relationship between Ira and Mercer deteriorated after an August 2018 billiards tournament that was intended to showcase ESB's billiards technology did not go as planned. ECF 1, ¶¶ 90-93; ECF 43 at 8.; Tr. Oct. 31, 2023 at 25.[4] Mercer hired an accounting firm, Citrin Cooperman ("Citrin"), in February 2019 to conduct a forensic audit of ESB. ECF 44-4, ¶ 182; Tr. Oct. 31, 2023 at 42. When Citrin examined the books and records of HighRock, it discovered the alleged inflated invoices and overbilling. ECF 44-4, ¶ 191.

## PROCEDURAL HISTORY

On April 17, 2019, Mercer sued Ira, Helen, HighRock, and Cannonbox in New York State Supreme Court, Nassau County, asserting, among others, claims for fraud, breach of fiduciary duty, and misappropriation against Ira, and for aiding and abetting fraud and aiding and abetting breach of fiduciary duty against Helen (Index No. 605310/2019, the "State Court Action").

On March 3, 2022, Ira and Helen (together, the "Debtors") filed a chapter 7 petition which stayed the State Court Action prior to any determination of liability. Mercer filed a proof of claim against the Debtors asserting an unliquidated claim based on the claims asserted in the State Court Action, and on June 3, 2022, he commenced this adversary proceeding seeking to except his claim from the Debtors' discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). *See* Claims Register, Proof of Claim No. 11. The Court conducted a trial over three days from

---

[4]    The docket in this adversary proceeding contains two different transcripts of the October 31, 2023 hearing. ECF 34, 38. The Court's references in this Decision are to the transcript at ECF 34.

October 30, 2023 to November 1, 2023 solely on the issue of the non-dischargeability of the Debtors' debt to Mercer. With the consent of the parties the issue of damages was held until non-dischargeability was determined.

The Court issued a Decision after trial (the "Non-Dischargeability Decision") finding that: (a) Ira's debt to Mercer, both individually and derivatively as a shareholder of ESB, is non-dischargeable under § 523(a)(2)(A) and (a)(4); (b) Mercer's claim against Ira under § 523(a)(6) is dismissed; and (c) all of Mercer's claims under § 523(a) against Helen, are dismissed. Non-Dischargeability Decision, ECF 45; *Mercer v. Lee (In re Lee)*, 2024 WL 1261790 (Bankr. E.D.N.Y., Mar. 25, 2024). On April 2, 2024, a judgment was entered on the finding of non-dischargeability ("Non-Dischargeability Judgment"). ECF 46. On April 16, 2024, Mercer appealed that portion of the Non-Dischargeability Judgment that dismissed Mercer's § 523 claims against Helen. ECF 49. Ira did not appeal the Non-Dischargeability Judgment.

On September 25, 2024, the Court conducted a continued trial to determine the dollar amount of Mercer's claim. The parties filed post-trial briefs on November 5, 2024 (ECF 75, 76), and reply briefs on November 13, 2024 (ECF 78, 82), and the matter was taken under submission.

On November 5, 2024, Mercer filed a motion seeking an award of attorney's fees in the amount of $535,768.65, and expert fees and costs in the amount of $71,782.86, for a total award of $607,551.51. ECF 74. Ira opposes Mercer's request for attorney's fees. ECF 80.

The instant Decision resolves the amount of Mercer's non-dischargeable claim as well as Mercer's request for fees and costs.

## JURISDICTION

The complaint in this adversary proceeding seeks only a determination under 11 U.S.C. § 523(a)(2), (4) and (6), as to the dischargeability of Mercer's yet unliquidated claim. Although there is pending litigation in state court to liquidate Mercer's claim, that litigation is stayed and has not been removed to this Court. However, this is an asset chapter 7 case and Mercer filed a proof of claim, and during the trial in this matter each party proceeded to litigate not only the issues of non-dischargeability but also the issue of damages. For that reason, this litigation involves not only a determination under § 523(a), which determination this Court has already made, but also a determination of Ira's liability on Mercer's claim under § 502 of the Bankruptcy Code. *See* 28 U.S.C. §157(b)(1), (b)(2)(B), (b)(2)(I); *see also Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1050 (9th Cir. 2014) (finding post-*Stern v. Marshall*, that "the bankruptcy court had the constitutional authority to enter a final judgment determining both the amount of [the creditor's] damage claims against [the debtor], and determining that those claims were excepted from discharge"); *cf. Porges v. Gruntal & Co. (In re Porges)*, 44 F.3d 159, 164 (2d Cir. 1995) (finding, pre-*Stern v. Marshall*, it is a "short and logical step for the bankruptcy court to enter a money judgment against [the debtor] on the basis of its section 502 determination . . . .").

## DISCUSSION

Mercer is claiming damages under three different categories: First, Mercer alleges that out of a total $2,586,184 he paid to HighRock based on invoices in the Pre-ESB Period, Citrin was unable to reconcile $354,386 that should have been paid out by HighRock to Vendors on account of those invoices. ECF 44-4, ¶ 48. He seeks to collect the $354,386 of these so-called "unreconciled disbursements" from Ira. Second, in the ESB Period, Mercer alleges that there is a

$304,612 discrepancy – aka "inappropriate transactions" – between amounts billed to ESB by Cannonbox and HighRock, and amounts actually paid to Vendors, including unsupported contractor charges and concealed mark-ups that Ira charged on transactions with Vendors at ESB's expense. ECF 76-1 at 2. Third, relying on New York's faithless servant doctrine, Mercer seeks to recover from Ira a total of $1,650,000 in compensation he and/or ESB paid to Ira through Cannonbox. Finally, Mercer is seeking to recover attorney's and expert fees and costs in the total amount of $607,551.51 as the "prevailing plaintiff" in this action. *See* N.Y. Bus. Corp. Law § 626(e).

The Court will address each of these categories of claims in order, but first the Court must address four preliminary issues: (1) the appropriate measure of damages; (2) the derivative nature of Mercer's claims; (3) the burden of proof on damages; and (4) Mercer's argument that Ira's defenses improperly seek a setoff.

## 1. Measure of damages

The measure of damages for a breach of fiduciary duty under New York law is the amount of the loss sustained by the plaintiff. *See, e.g.*, *Herman v. Herman*, 162 A.D.3d 459, 460 (N.Y. App. Div. 2018). The measure of damages for fraud is "'indemnity for the actual pecuniary loss sustained as the direct result of the wrong, . . ..'" *Nettles v. LSG Sky Chefs et al.*, 94 A.D.3d 726, 731-32 (N.Y. App. Div. 2012).

Ira argues that Mercer has not sustained any loss and is not entitled to monetary damages despite this Court's findings of fraud and breach of fiduciary duty because Mercer and ESB in all instances paid fair market value for goods and services despite Ira's markups, and any billing discrepancies identified by Citrin are all reconciled in Ira's post-trial brief or are nominal and should be forgiven. Ira also points out that Mercer is seeking to collect from him personally

funds that in all instances were paid by Mercer and ESB to either HighRock or Cannonbox, not Ira directly. Ira argues this is inappropriate because Mercer has not alleged or proven that HighRock and Cannonbox were alter egos of Ira. ECF 75-1 at 5.

Mercer maintains that Ira should not be permitted to escape damages because he used third-party companies that he owned or controlled to accomplish his fraudulent scheme. ECF 82 at 6-7 (citing Non-Dischargeability Decision, ECF 45 at 19). Moreover, he argues that the evidence presented in this case shows that Ira paid himself profits from HighRock and Cannonbox which establishes that Ira profited from the "ill-gotten" gains flowing from his wrongful conduct. ECF 82 at 7.

The Court agrees with Mercer. In addition, the Court notes that Mercer is not seeking damages on a breach of contract theory which generally would require privity among the parties. He is seeking damages on account of Ira's fraud and breach of fiduciary duty which are tort claims against Ira with damages flowing therefrom regardless of privity.

In his attempt to reconcile payments HighRock and Cannonbox made to Vendors on Mercer's and ESB's behalf, Ira essentially is asking this Court to measure Mercer's contributions to the venture against the aggregate amount paid out by HighRock and Cannonbox to Vendors. This is necessary to Ira's defense because Ira paid little attention to any formal system of bookkeeping or tracking payments into and out of HighRock and Cannonbox on account of specific invoices. In this Court's view, Ira should not be permitted to benefit from this imprecise record keeping. The Court finds it is appropriate in this case to measure damages, *i.e.*, Mercer's and ESB's actual losses, by comparing (i) the funds contributed to HighRock and Cannonbox by Mercer and ESB for the payment of specific Vendor invoices, to (ii) the funds HighRock and Cannonbox actually paid out to Vendors on those specific invoices. This measure will capture not

only funds contributed to the venture by Mercer and ESB for which Ira cannot account, but will also capture profits Ira charged Mercer and ESB in violation of his fiduciary duty.

## 2. Derivative nature of the claims

Of the total $2,313,998 in damages sought by Mercer in this action $1,609,612 is derivative in nature, *i.e.*, damages he is pursuing on ESB's behalf.[5] *See* N.Y. Bus. Corp. Law § 626(a). Mercer recognizes the default rule that any damages recovered by a plaintiff suing derivatively inure to the benefit of the company, not the individual. ECF 76-1 at 3-4, 24-26. Despite this, Mercer argues that he, individually, should be permitted to collect any damages attributable to the derivative claims because he is the shareholder that sustained a loss disproportionate to the corporation. ECF 76-1 at 25 (citing *Cortazar v. Tomasino*, 150 A.D.3d 668 (2d Dep't 2017); *Venizelos v. Oceania Mar. Agency*, 268 A.D.2d 291 (1st Dept. 2000); and *Stavroulakis v. Pelakanos et al.*, No. 653478/2015, 2018 WL 846677 (Sup. Ct. N.Y. Co., Feb. 13, 2018)). Mercer also argues that the bankruptcy court is a "court of equity" and awarding damages to ESB "would not be the most equitable result" because Mercer funded all of ESB's operations and if damages were awarded to ESB it could indirectly benefit Ira because he is currently a 50% shareholder of ESB. ECF 76-1 at 4. Ira argues there is no basis to depart from the default rule which requires that damages for derivative claims be paid to the corporation. He alsopoints out that the language in *Stavroulakis v. Pelakanos*, relied on by Mercer, was dicta that should not be followed by this Court.

The Court agrees with Ira and finds no basis to depart from the rule under New York law that any damages awarded on account of a derivative claim inure to the benefit of the

---

[5]    $304,612 of the $1,609,612 arises out of alleged inappropriate and fraudulent transactions that Ira structured through HighRock and Cannonbox while acting as ESB's president during the ESB Period. The remaining $1,305,000 is the amount paid by ESB to Ira during the ESB Period for Ira's services. ECF 76-1 at 2-3.

corporation. *See Paradiso & DiMenna, Inc. v. DiMenna*, 232 A.D.2d 257, 258 (N.Y. App. Div. 1996) (finding "that the award of damages to the individual plaintiff was error" where conversion of funds from corporate account resulted in corporate injury; injury to plaintiff was real but only derivative and funds should have been awarded to corporation). Further, in *Stavroulakis v. Pelakanos* damages were not at issue and the court only "found it worth noting" that it was "strongly inclined" to award the individual plaintiff a direct monetary recovery commensurate with his interest in the company. *Stavroulakis v. Pelakanos*, 2018 WL 846677 at *13-14. The court in *Stavroulakis v. Pelakanos* specifically stated that it was "mindful of the possible issues such an approach may present and finds it prudent to forgo any formal determination of the proper remedy until the issue can be fully briefed after trial." *Id.*\*14. The remainder of the cases cited by Mercer are not persuasive and this Court could find no clear precedent for the principal that New York law dictates that damages for Mercer's derivative claim should be paid directly to him and not ESB. For these reasons, any damages awarded on account of Mercer's derivative claim will be awarded to ESB, not Mercer individually.

### 3. **Burden of proof**

Under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, "[a] proof of claim executed and filed in accordance with [the Bankruptcy Rules] is prima facie evidence of the validity and amount of the claim." *See* Fed. R. Bankr. P. 3001(f). If an objection to claim is filed, the burden is on the objecting party to rebut the presumption of validity with "evidence equal in force to the prima facie case ... which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Allegheny Int'l,* 954 F.2d 167, 173–74 (3d Cir. 192). If that burden is met by the objector, the burden is shifted back to the claimant which must

then prove by a preponderance of the evidence that under applicable law the claim should be allowed. *Id.* at 174.

Here, Mercer properly executed and filed a proof of claim in an unliquidated amount, which amount was later made clear in post-trial submissions to this Court in the damages phase of this trial. Ira's answer in the adversary proceeding disputing the extent of Mercer's damages, along with Ira's more detailed post-trial submission on the issue of damages are viewed by this Court as an objection to Mercer's proof of claim. This Decision will examine whether Ira has produced "evidence equal in force to the prima facie case" sufficient to rebut the presumption of validity of Mercer's claim.

In this regard, the Court will note that Ira has the burden of proving that the funds he says were paid out on specific Vendor invoices were actually paid to the appropriate parties. The Court will give no evidentiary weight to HighRock's and Cannonbox's general ledgers absent corroborating evidence in their bank records which show not only that payments were made on certain dates and in certain amounts, but also proving that those payments were actually received by the Vendors Ira claims to have paid.

### 4. Setoff

Prior to the damages trial, Ira argued he had the right to set off against any amounts he was ultimately found to owe Mercer, "expenses incurred by Ira to secure goods, services and products provided to [Mercer and ESB], for which payment was not made." ECF 64 at 1. He sought a setoff based on monies HighRock and Cannonbox paid on behalf of ESB to engineers, consultants and vendors that rendered services to ESB, but for which ESB never reimbursed HighRock or Cannonbox. ECF 64 at 3. According to Ira this setoff included specialized pool

tables and related items that Ira purchased and installed for the benefit of Mercer and his family, and for which Mercer refused to pay after having allegedly approved invoices for same. *Id.*

Several issues were presented by Ira's setoff argument, including the fact that Ira failed to list these alleged claims against Mercer as an asset in this bankruptcy case, and he failed to assert setoff as a defense in this adversary proceeding. The Court invited briefing on the issues and ultimately Ira withdrew his setoff defense. ECF 64, 66, 67, 68, 69.

Mercer argues in his post-trial brief that despite having withdrawn his setoff defense, Ira is improperly advancing setoff arguments in seeking to limit Mercer's damages. In rebutting Mercer's damage calculation, Ira identifies a series of payments made by HighRock to Vendors for which Citrin's analysis allegedly fails to account. Citrin's analysis compared (a) invoices from HighRock and Cannonbox to Mercer and ESB which contain specific charges for Vendors' goods and services, with (b) payments by HighRock and Cannonbox to Vendors which match the invoices in (a). Mercer argues that he was never invoiced for payments HighRock now seeks credit for, and to the extent Ira seeks a credit for those amounts he is seeking a setoff which has been precluded by this Court. *See. e.g.,* ECF 82 at 14.

For the most part, Mercer's complaints that Ira is improperly asserting a setoff are unfounded. The majority of Ira's arguments in seeking to limit Mercer's damages, which are discussed in detail below, do not claim that Mercer or ESB were issued invoices that were not paid by ESB. The bulk of Ira's defense is that in the aggregate HighRock and Cannonbox paid Vendors just as much if not more than Mercer and ESB paid to HighRock and Cannonbox and therefore Mercer was not damaged. This Court's previous statement of the measure of damages in this case rejects this "aggregating" of invoices versus payments and thus the concern that Ira is seeking an improper setoff is for the most part moot. *See supra* Section 1.

5.  **Categories of damages**

   a.   *"Unreconciled disbursements" during the Pre-ESB Period*

Mercer seeks to recover damages in the amount of $354,386 with respect to transactions

for billiards-related projects during the Pre-ESB Period resulting from Ira's breach of fiduciary

duty and fraud. ECF 76-1 at 13, ¶¶ 47,48. Generally speaking, Mercer claims that during the Pre-

ESB Period he paid $2,586,184 to HighRock based on a series of invoices issued by HighRock

to Mercer, *see* Exs. 133, 137[6] (Invoice #s 1011-1012, 1023-1027, 1029-1033, 1036-1042), and

HighRock in turn only paid $2,213,798 to Vendors, including its landlord Carom Café, on

account of those invoices. *See* Exs. 131, 137. The difference between these two amounts is what

Mercer is claiming as damages for "unreconciled disbursements."

In his post-trial brief, Ira cites to HighRock's general ledgers and bank statements and

argues, as detailed below, that Mercer's calculations do not include a total of approximately

$342,000 in distributions made by HighRock to Vendors. ECF 75-1 at 8, 9. Ira explains that the

amount of the alleged unreconciled disbursements is actually only $11,938. *Id* at 10. Ira then

argues that this remaining discrepancy should be forgiven because Ira did not intend to cheat

Mercer; rather he was entitled to collect a mark-up on goods and services. ECF 75-1 at 7. Mercer

argues that the additional payments detailed by Ira in his post-trial brief should not be considered

by this Court because they were not raised by Ira during the damages trial, and Mercer had no

opportunity to question Ira about these transactions. ECF 82 at 11.

The Court will consider the arguments raised by Ira in his post-trial brief because the

brief does not assert any new facts or rely on any new evidence. The general ledgers and bank

statements upon which Ira relies were all part of the record in this case during the damages trial.

---

[6]       Numeric exhibits are Plaintiff's. Lettered exhibits are Defendants'.

Mercer had a full and fair opportunity to question Ira on each and every trial exhibit and this Court finds no basis to preclude Ira from making an argument in his post-trial brief based on facts contained in the trial exhibits.

Ira's assertions as to HighRock payments to Vendors which should be credited against Mercer's damages calculations, are as follows:

OK Billiard

HighRock invoiced Mercer $111,000 on July 14, 2014 to purchase six billiard tables from OK Billiard. Exs. 133 (Invoice #1011), 136. Ira claims that notwithstanding HighRock's invoice for the full amount, he only asked Mercer to pay the required 75% deposit for the pool tables. ECF 75-1 at 11. It is undisputed, however, that Mercer paid HighRock the entirety of the OK Billiard invoice in 2014. Tr. Sept. 25, 2024 at 56[7]; Ex. 136. HighRock paid OK Billiard a total deposit of $61,242.90 in two payments, on July 22, 2014 and on September 16, 2014. Ex. 137. Mercer is seeking as damages the difference between the $111,000 he paid to HighRock for the tables, and the $61,242.90 that HighRock paid to OK Billiard in 2014, *i.e.* $49,757.10.

According to Ira, the balance owed to OK Billiard was in fact paid in 2018 when he claims the pool tables were delivered. ECF 75-1 at 11; Tr. Sept. 25, 2024 at 56-58. To support this he cites to HighRock's general ledger from 2018 showing that HighRock disbursed $23,400 and $23,393.00 to OK Billiard, on March 7, 2018, and March 22, 2018, which would bring the total paid to OK Billiard in 2014 and 2018 up to $108,035.90. *See* ECF 75-5, Ex. B at 80.[8]

---

[7]        The docket in this adversary proceeding contains two different transcripts of the September 25, 2024 hearing. ECF 71, 72. The Court's references in this Decision are to the transcript at ECF 71.

[8]        Exhibit B to Ira's post-trial memorandum of law with respect to the issue of damages (ECF 75) contains select pages of HighRock's general ledger which was admitted as trial Exhibit B. Exhibit B to

This is the first of many incredible explanations by Ira, which will be detailed in this Decision, in an attempt to justify what would be generously described as loose bookkeeping practices he engaged in in his dealings with Mercer and ESB. Having found that Ira engaged in fraud and breach of fiduciary duty in his relationship with Mercer and ESB, this Court is not inclined to give credence to Ira's testimony that the 2018 payments to OK Billiards actually related to tables that were ordered four years earlier. Ira's explanation only leads this Court to more questions about this transaction. Why did the 75% deposit Ira claims was due equal $61,242.90 when a 75% deposit on a $111,000 purchase would have been approximately $83,000? Why did the total payments made to OK Billiard in 2014 and 2018 add up to $108,035.90, not $111,000? Why did it take four years to deliver the pool tables? Where are the canceled checks proving that those funds were in fact paid to OK Billiard in 2018? Left with numbers that do not add up and more questions than answers this Court will not give Ira a credit against Mercer's damage calculation for the $46,793 allegedly paid to OK Billiard in 2018.

Carom Café

HighRock leases "lab space" from Carom Café. ECF 75-1 at 11. Ira argues that Citrin's analysis fails to account for $62,450 in rental payments, security deposit and construction costs paid by HighRock to Carom Café in the Pre-ESB Period, from July 2014 to September 2015. *Id.* Specifically, Ira argues that HighRock made the following five payments on account of invoices to Mercer which are not credited in Mercer's damages calculations: $17,600 on July 16, 2014 (Invoice #1012); $15,300 on October 15, 2014 (Invoice #1024); $9,600 on November 6, 2014 ("Rent"); $15,000 on September 29, 2015 (Invoice #1038); and $5,750 on October 10, 2015

---

the post-trial memorandum of law contains page numbers for reference, while trial Exhibit B does not. For that reason, the Court cites to Exhibit B to ECF 75 rather than trial Exhibit B.

(Invoice #1038).[9] *Id.* As proof of these payments, Ira relies on entries in HighRock's general ledger (Ex. B), and a summary of HighRock's payments to Carom Café prepared by Ira based on HighRock's bank records. Ex. VVVV (Ira's summary); Ex. 134 (bank records); Tr. Sept. 25, 2024 at 44-46. Exhibit VVVV was admitted into evidence over Mercer's objection on the premise that HighRock's bank records would corroborate Ira's summary of payments to Carom Café. *Id.* In calculating damages, Citrin only gave credit to HighRock for payments to Carom Café if those payments corresponded to items HighRock invoiced to Mercer. ECF 82 at 13. According to Mercer, HighRock's invoices to Mercer did not reflect these amounts for the dates included in Ira's rebuttal calculations. *Id.*

Exhibits 133 and 136 show that Mercer was invoiced various amounts on various dates for expenses related to Carom Café. Exs. 133, 136. There is no dispute that Mercer paid those invoices. The issue is whether HighRock used those funds to pay Carom Cafe. The Court will address each of these payments in order:

Ira claims that HighRock paid Carom Café $16,800 on July 16, 2014 related to a $16,000 HighRock invoice to Mercer for a total of five months' rent at $3,200 per month. Ex. 133 (Invoice #1012).[10] Although Ira claims that this payment (check #163) was made to Carom Café, there is no canceled check in evidence to prove this. Moreover, the numbers do not match up. Why would HighRock pay Carom Café more than the amount due on that invoice?

Ira claims that HighRock paid Carom Café $15,300 on October 15, 2014 related to a $12,100 HighRock invoice to Mercer, dated November 17, 2014, for build out and construction work at the premises. Ex. 133 (Invoice #1024). Not only does this HighRock payment to Carom

---

[9]    These payments add up to $63,250, not $62,450 as Ira argues.
[10]    The actual payment reflected in HighRock's general ledger is $17,600, but Ira reduced this to $16,800 to reflect an $800 credit. *See* ECF 75-1 at 11 n.4.

Café not match the amount of the invoice to Mercer, but HighRock's bank statements merely reflect this transaction as a "debit" which provides no proof that this payment was made to Carom Café. Ex. 134.

Ira claims that HighRock paid Carom Café $9,600 on November 6, 2014 for "rent" without providing any related invoice number. Not only is there no corresponding invoice to Mercer for this charge, but this alleged payment was also merely reflected in HighRock's bank statement as "debit" with no evidence that this payment was actually made to Carom Café. Ex. 134.

Ira claims that HighRock paid Carom Café $5,750 and $15,000 on October 10, 2015 and September 29, 2015, respectively, related to Invoice #1038, which is dated October 6, 2015, and which contains charges for various Vendors in varying amounts. Included in this invoice to Mercer is a total of $7,700 in charges for rent and build out costs owed to Carom Café. Ex. 133 (Invoice #1038). So, Ira is claiming that a total of $20,750 was paid by HighRock to Carom Café on account of a total of $7,700 which was billed to Mercer. Not only do these numbers not add up but the payments Ira is claiming were made are not verified by the evidence. Although HighRock's general ledger indicates that a payment of $15,000 was made to Carom Café on September 29, 2015, there is no such disbursement shown in the corresponding bank statements. Ex. 134. The alleged $5,750 payment to Carom Café on October 10, 2015 also is not proven by the evidence. HighRock's bank statements do reflect a $5,750 payment (check #3075) drawn on HighRock's account on October 22, 2015, but there is no corresponding canceled check or other evidence that this check was negotiated by Carom Café. Ex. 134.

For all of these reasons, the Court will not give credit to Ira for the above-mentioned alleged payments made by HighRock to Carom Café in 2014 and 2015.

Sales Tax

Ira testified that HighRock made a payment of $31,418.77 to New York state on June 29, 2015 for sales taxes, which corresponds to Invoice #1029 to Mercer, and he should be given a credit against damages for this amount. Tr. Sept. 25, 2024 at 59-60; ECF 75-1 at 12. A payment of sales tax in that amount is reflected in HighRock's general ledger. ECF 75-4, Ex. B at 55 (check #3037). Check #3037 in this amount on this date is also reflected in HighRock's bank statement, but there is no canceled check or other evidence that this amount was actually paid to New York State. Ex. 134.

Exhibit 136 shows that HighRock charged Mercer for sales tax across several different invoices in the Pre-ESB Period from May 2015 to December 2015. Ex. 136. In Exhibit 137, Mercer's calculation of amounts paid to Vendors on account of these HighRock invoices Mercer gives Ira credit for various payments made by HighRock to New York state for sales tax. Mercer does not give Ira credit for payments to New York state that do not correspond to HighRock invoices to him. The Court will not give Ira credit for the alleged payment of $31,418.77 to New York state on June 29, 2015 for sales taxes for two reasons. One, the charges to Mercer for sales tax contained in Invoice #1029 add up to $24,169.03. This does not match with the $31,418.77 payment that Ira claims was made on account of the charges in Invoice #1029. Second, without a canceled check or some other acknowledgement by New York state that payment in that amount was in fact received, this Court will not accept the general ledger as proof of payment.

Sonus Productions ("Sonus")

Ira identifies two entries in HighRock's general ledger dated March 31, 2015, reflecting HighRock payments to Sonus in the amounts of $2,905.94 (check #3024) and $7,338.56 (check

#3048), which payments are not credited in Mercer's damage calculation. ECF 75-1 at 12. Ira claims that these two payments, which total $10,244.50, correspond to HighRock's Invoice #1031, dated May 11, 2015, to Mercer. ECF 75-1 at 10. HighRock's bank statements reflect that these numbered checks were drawn on HighRock's account on April 1, 2015 and August 19, 2015, respectively.

Mercer argues that he was never invoiced those amounts on those dates and unless the invoices can be matched to payments to Sonus, Ira should not receive credit for those payments. The Court agrees. Invoice #1031 cited by Ira totals $65,225.02 and contains charges for various items provided by several different vendors. The line item for Sonus in this invoice totals only $1,696.48. Ira's claim that these two payments which total $10,244.50 should be applied against a $1,696.48 charge makes no sense. The Court will also note that other than Ira's notation in the general ledger that these checks were negotiated to Sonus there are no canceled check images attached to the bank statements and no other evidence that these checks were actually negotiated to Sonus. The Court will not give Ira credit for these payments.

Lighting Design Group ("LDG")

Ira identifies two payments allegedly made by HighRock to LDG which relate to HighRock invoices to Mercer and which were not credited to HighRock in Mercer's damages calculation: $4,000, check #3004, Sept. 15, 2014 (related to Invoice #1023 to Mercer); and $27,200.62, check #3018, February 27, 2015 (related to Invoice #1026 to Mercer). ECF 75-1 at 10, 12.

The total amount invoiced to Mercer for LDG charges in Invoice #1023 was $12,400. There are other charges on Invoice #1023 which may or may not relate to LDG, but no charge specifically for $4,000. Without an invoice to Mercer which corresponds to the payment made by

HighRock to LDG, the Court cannot give credit to Ira for this alleged $4,000 payment to LDG. Moreover, with respect to this $4,000 alleged payment to LDG, Ira relies solely on HighRock's general ledger, Ex. B, prepared by Ira based on HighRock's bank statements, as proof of that payment. Also in evidence is HighRock's bank statement for September 2014 showing that check #3004 was drawn on HighRock's account in the amount of $4,000. Ex. 134. However, there is no canceled check proving that the check was written to and received by LDG. Absent proof that the $4,000 was actually paid to LDG the Court will not give HighRock credit for that payment.

With respect to second payment which Ira claims he was not given credit for the Court notes that a payment of $27,200.62 on January 29, 2015, was in fact credited to HighRock payments in Citrin's forensic analysis. No further credit against damages is warranted. Ex. 136.

Mercer's damage claim will not be reduced by any amount for this category.

Automation Lab Experts ("ALE")

Ira seeks to reduce Mercer's damages calculation based on two payments to ALE he claims HighRock was not given credit for. The first is for $6,000 on March 26, 2015. Ira claims this payment was for a retainer which was "expensed" by HighRock. ECF 75-1 at 10, 13. The second is for $4,575 on July 12, 2016 (check #3123). Ira claims both payments relate to Invoice #1027 to Mercer. Mercer claims he was only invoiced once for payments to ALE for $12,000 on January 29, 2015, but not for $6,000 and $4,575 and therefore no credit was given for these payments. ECF 82 at 15.

Invoice #1027 to Mercer contains one charge for ALE for 80 hours of consulting fees charged at $150 per hour, for a total of $12,000. Ex. 133. Even if the Court were inclined to aggregate the HighRock payments to ALE, the total payment Ira claims HighRock made to ALE ($10,475) does not match the $12,000 invoice to Mercer. Not only do the amounts not match but

Ira provides no explanation why HighRock would pay ALE $4,575, on July 12, 2016, nearly eighteen months after Mercer was invoiced for ALE's services. Moreover, the alleged payment to ALE of $4,575 on July 12, 2016, is not reflected in HighRock's bank statements and no canceled check has been admitted into evidence. Ex. 134. With respect to the alleged $6,000 payment, HighRock's bank statements only reflect a "debit" of $6,000 on March 26, 2015. HighRock's general ledger reflects that the $6,000 payment on March 26, 2015 was disbursed to Ira for "NAB spending cash." ECF 75-4, Ex. B at 53. According to Ira, he expensed the $6,000 retainer payable to ALE. Ira has presented no documentary evidence to show that the $6,000 was actually paid to ALE.

Mercer's damage claim will not be reduced by any amount for this category.

National Instruments

Ira claims that Mercer's calculations do not take into account $12,391.68 paid to National Instruments on September 29, 2015, which payment corresponds to Invoice #1027 to Mercer. ECF 75-1 at 10, 13. Mercer argues that he was invoiced for six items on January 29, 2015 totaling $21,579, but was not invoiced for $12,391.68. ECF 82 at 15; Ex. 133 (Invoice #1027).

As proof of this payment, Ira relies on an entry in HighRock's general ledger, dated September 29, 2015, which refers to a $12,391.58 payment by check to National Instruments. The general ledger entry also contains a notation which states, "deleted." ECF 75-4, Ex. B at 57. However, HighRock's September 2015 bank statement does not reflect any payment in the amount of $12,391.68. Ex. 134.[11] Even if the alleged payment to National Instrument matched

---

[11]    The Court notes that Exhibit CCCC contains a copy of an "Official Check" made out to National Instruments in the amount of $12,391.68 re: HighRock. Ex. CCCC. There is no copy of the back of the check, no corresponding debit from HighRock's account, and no evidence that this check was negotiated.

up with an invoice to Mercer, which it does not, this Court has no evidentiary basis to give Ira
credit for this alleged payment to National Instruments absent proof in the bank statement.

Mercer's damage claim will not be reduced on account of this category.

Kwang S. Ok

Ira claims that Mercer's calculations do not take into account a $671.72 payment (check
#3017) made by HighRock to Kwang S. Ok on February 18, 2015, which payment allegedly
corresponds to HighRock Invoice #1031 to Mercer. ECF 75-1 at 10, 13. Mercer argues that he
was never invoiced for a $671.72 expense to Mr. Ok. Exs. 133, 136.

HighRock's general ledger reflects a payment to Mr. Ok in the amount of $671.72 on
February 18, 2015. ECF 75-4, Ex. B at 52. Check #3017 in this amount is reflected in
HighRock's bank statements. Ex. 134. However, there is no corresponding charge to Mercer
contained in Invoice #1031 as Ira claims. In addition, no canceled check or other document has
been produced to prove that this payment was actually made to and received by Mr. Ok.

Mercer's damage claim will not be reduced on account of this category.

Lite Systems

Ira claims he should be given credit for two payments by HighRock to Lite Systems –
$4,962 on July 27, 2015 (check #3051), and $9,924 on October 19, 2015 (check #3068) – both of
which correspond to Invoice #1036 to Mercer. ECF 75-1 at 10, 13; ECF 75-4, Ex. B at 56, 57.[12]
According to Mercer, he was never invoiced for those amounts. ECF 82 at 16; Exs. 136, 137.

Invoice #1036 to Mercer, dated August 11, 2015, contains two separate line items for Lite
Systems charges: one for $3,158, and the other for $19,848, which totals a $23,006 charge to
Mercer for Lite Systems goods/services in Invoice #1036. The amount Ira claims HighRock paid

---

[12]    The Court notes that HighRock's general ledger contains a notation next to each of these ledger
entries which states "deleted". Ira has provided no explanation as to the significance of this notation.

Lite Systems on account of this invoice ($14,886 in total), is not even close to matching Invoice #1036 ($23,006). Moreover, HighRock's bank statements do not prove these payments were made to Lite Systems. They show payment to an unidentified payee in the amount of $4,962, on August 4, 2015 (check #3051), and another payment to an unidentified payee in the amount of $9,924 on October 19, 2015 (check #3068). Ex. 134. However, as with the others, there are no canceled checks showing that Lite Systems is actually the payee on these checks or that they were negotiated by Lite Systems. Without this proof the Court finds that Ira is not entitled to any credit against Mercer's damage claim for these amounts.

Michael Drazin

Ira claims that a payment by HighRock to Michael Drazin for $7,500 on October 19, 2015 (check #3072) was not credited to HighRock in Mercer's damages calculation. ECF 75-1 at 13; ECF 75-4, Ex. B at 57. Mercer argues that he was invoiced for $7,500 twice for Mr. Drazin's services, in September and November 2015, but not for services in October 2015. ECF 82 at 17.

Contrary to Mercer's assertion, Invoice #1038 to Mercer, dated October 6, 2015, does contain a line item for a $7,500 charge for Mr. Drazin's services. Ex. 133. Nonetheless, although a payment of $7,500 on October 19, 2015, is reflected in HighRock's general ledger and bank statements Ira has not produced any canceled check to show that the check was written to and negotiated by Mr. Drazin. Ex. 134. Without proof that this check was in fact negotiated to Mr. Drazin, this Court cannot give Ira credit for it.

Solatron Security Systems ("Solatron")

Ira seeks credit for a payment HighRock allegedly made to Solatron for $299.42 on November 19, 2015 (check #3080) which is reflected in HighRock's general ledger and bank statements. ECF 75-1 at 13; ECF 75-4, Ex. B at 58; Ex. 134. Ira claims this payment corresponds

to Invoice #1040 to Mercer. However, Invoice #1040 contains no charge for goods or services of Solatron. In addition, although check #3080 in the amount of $299.42 was debited from HighRock's account on November 24, 2015, Ira has provided no canceled check or other proof that check #3080 was in fact written to or negotiated by Solatron other than HighRock's general ledger. Without this proof the Court finds that Ira is not entitled to any credit against Mercer's damage claim for this amount.

Cannonbox

Ira argues that Mercer's damages calculation does not account for $80,000 paid by HighRock to Cannonbox. ECF 75-1 at 14. These were, according to Ira, Pre-ESB expenses charged to Mercer in Invoice #s 1041 and 1042, dated January and February 2016, which were paid by HighRock in the ESB Period. Ira cites to the following entries in the HighRock general ledger showing Cannonbox as the payee: $20,000 on August 31, 2016 (check #3135); 20,000 on December 16, 2016 (check #3150); $10,000 on September 11, 2017 (check #3205); and $30,000 on October 6, 2017 (check #3212). ECF 75-1 at 10, 14; ECF 75-4, Ex. B at 66, 69, 75, 76; Ex. 133.

Invoice #s 1041 and 1042 contain charges to Mercer for services provided through Cannonbox which total $80,000 (a total of 320 hours billed at $250 per hour for January and February 2016). Invoice #1041 contains one line-item entry for $40,000 and Invoice #1042 contains a similar single line-item entry for $40,000. Although the total amount invoiced to Mercer and the total amount paid by HighRock to Cannonbox are the same, $80,000, Mercer contends that there is no rationale behind paying those charges for time billed in January and February 2016 up to 18 months later, and that he was never invoiced for a $30,000 charge. ECF 82 at 18.

The Court need not address whether the delay in paying those invoices was justified or warranted. There is no evidence that these checks were written to and negotiated by Cannonbox. Absent canceled checks or some other evidence to prove these payments were made to Cannonbox this Court will not give Ira credit for these payments.

B&H Photo

Ira claims HighRock paid B&H Photo $717.48 on February 19, 2016 via PayPal, and this payment corresponds to Invoice #1042 to Mercer. ECF 75-1 at 10, 14. Mercer argues that Citrin was not provided the information relating to this transaction and it is not included in HighRock's bank statements. ECF 82 at 19. Although there is a charge in Invoice #1042 for B&H Photo in the amount of $717.48, and payment to B&H in this amount is reflected in HighRock's general ledger, there is no payment in the amount of $717.48 reflected in HighRock's February 2016 bank statement. Ex. 134. Again, without proof of this payment the Court will not give credit to Ira for it.

Inventory

Ira argues that HighRock paid $1,846.64 on May 11, 2015, to purchase inventory, and this corresponds with Invoice #1030 to Mercer. ECF 75-1 at 10, 14. Mercer points out that there is no evidentiary support for this payment in HighRock's bank statements. ECF 82 at 19. Although Invoice #1030 does charge Mercer for that exact amount, Ira does not point to any general ledger entry reflecting payment in that amount, nor does he cite to bank statements which would support this alleged payment. Therefore, this Court will not give Ira credit against damages for this amount.

<u>Work Performed by Ira during the Pre-ESB Period</u>

Ira identifies four invoices by HighRock to Mercer that he claims include charges for services he performed in the amounts of: $12,000 (Ex. 133, Invoice #1026); $4,868 (Ex. 133, Invoice #1023); $2,985 (Ex. 133, Invoice #1025); and $11,600.48 (Ex. 133, Invoice #1031), for which he was not paid, and for which he now seeks credit as a reduction from damages. ECF 75-1 at 14-15. Ira claims that he performed this work in-house and payment for these services was never disbursed, *i.e.*, it remained in HighRock's bank account. Therefore, he claims he should receive a credit for these unpaid charges.

Mercer does not deny that these services were invoiced to him and funds were not disbursed to Ira to compensate for these services. Rather, Mercer claims that Ira made several personal charges against HighRock's account that should be deducted from any amount Ira alleges "remained in HighRock's bank account" on account of these charges. ECF 82 at 19-20.

The Court makes no findings as to what may or may not be personal charges by Ira against HighRock's account. However, the Court finds that Mercer's damages calculation should not be reduced by these amounts Ira claims remain unpaid. This would amount to a setoff which defense has already been precluded by this Court. *See supra* Section 4.

   b.   *"Inappropriate transactions" during the ESB Period*

Mercer seeks to recover damages in the amount of $304,612 with respect to transactions with HighRock and Cannonbox Vendors during the ESB Period. ECF 76-1 at 13-17 ¶ 50-62. Mercer claims that during the ESB Period there is a discrepancy between the amounts ESB paid to HighRock and Cannonbox for goods and services and the amounts HighRock and Cannonbox in turn paid for those same goods and services. The difference between these two amounts is what Mercer is calling "inappropriate transactions." More specifically, Mercer seeks: (a)

$108,845 in damages in relation to the discrepancy between the amounts that Cannonbox invoiced ESB for Vendors' services and the amount Cannonbox actually paid to those Vendors; (b) $139,462 in damages with respect to the discrepancy between what HighRock billed ESB for goods from Telemetrics and the amount that HighRock actually paid Telemetrics for those goods; (c) $43,892 in damages, reflecting Ira's improper markups on HighRock invoices for products provided by Vendors other than Telemetrics; (d) $6,413 in damages attributable to HighRock's double-billing to ESB; and (e) $6,000 in damages for an unsupported HighRock disbursement. *Id.*; Ex. 110.

Ira argues Citrin failed to credit Ira for certain HighRock and Cannonbox payments to Vendors in his analysis and provides explanations to identify the omissions. ECF 75-1 at 16-17. Ira cites to Cannonbox's general ledger and Ira's testimony at trial to disprove the alleged inappropriate transactions. *Id.* In particular, Ira asserts that: (i) Cannonbox paid $103,452 of the $108,845 to the Vendors identified in Exhibit 111, and that the discrepancy of $5,393 was a result of poor budgeting, not an intent to defraud; (ii) Mercer did not prove damages with respect to goods provided by Telemetrics and AJA Video Systems and in any event ESB paid a fair price for those goods; (iii) aggregating receipts and disbursements, HighRock's payments to Vendors exceed the amount paid by ESB to HighRock by $5,898; (iv) any instances of double-billing are a result of clerical errors that Ira sought to correct; and (v) the allegedly unsupported $6,000 HighRock disbursement was made to a professional billiards player for filming services in relation to the billiards lab. ECF 75-1 at 3-4, 16-17.

As detailed below, the Court will compare the funds contributed to HighRock and Cannonbox by ESB for the payment of Vendors, to the funds Ira can prove HighRock and Cannonbox actually paid out to those Vendors.

i. <u>Discrepancies between the amounts Cannonbox invoiced ESB for Vendors' services and the amount actually paid by Cannonbox to those Vendors</u>

Exhibit 111 is a spreadsheet in which Citrin lists 11 individuals whose services were billed to ESB through Cannonbox. In the exhibit, Citrin adds up the total amount of invoices paid by ESB to Cannonbox on account of services provided by each individual. Next, the exhibit provides the total amount that was actually disbursed by Cannonbox to each individual. Mercer seeks as damages the difference between what ESB paid to Cannonbox for those services and what Cannonbox actually paid for those services.

<u>William Hanisch</u>

Exhibit 111 shows that ESB paid Cannonbox $368,775 on account of Mr. Hanisch's services, and Cannonbox paid Mr. Hanisch $378,000. Ex. 111. Ira points out that Cannonbox overpaid Mr. Hanisch by $9,325, and claims that "Mercer did not seek to reconcile this (or any other) overpayment with Mercer's theory that Cannonbox (and HighRock) underpaid Vendors." ECF 75-1 at 18.

Mercer's damages analysis in Exhibit 111 aggregated overpayments and underpayments to various individuals. As such Ira was given credit for this overpayment as a reduction from the underpayments discussed below. The Court finds that Mercer's damages analysis properly took into account this overpayment and there will be no adjustment to Mercer's damage calculation for overpayments to Mr. Hanisch.

<u>Eric Kwon</u>

Mercer's damage calculation in Exhibit 111 also reflects overpayments to Mr. Kwon in the amount of $768. However, Ira argues that Cannonbox actually overpaid Mr. Kwon by $16,768. ECF 75-1 at 18-19. He identifies four payments to Mr. Kwon: $4,000 on December 15,

2018, $4,000 on January 3, 2019, $4,000 on February 11, 2019, and $4,000 on March 20, 2019, that were allegedly omitted from Citrin's forensic analysis. ECF 75-1 at 18-19. Ira cites to Cannonbox's general ledger (Ex. A) but does not provide Cannonbox's bank statements to support those payments. *Id.* Mercer argues that these alleged additional payments to Mr. Kwon were not reflected in Exhibit 111 because they did not match with Cannonbox invoices to ESB.

The Court will not give Ira credit for the alleged additional $16,000 payments because Ira has failed to provide any evidentiary proof that these additional payments were actually made to Mr. Kwon. The general ledgers do not hold any evidentiary weight due to Ira's admittedly bad bookkeeping. *See supra* Section 1. Without appropriate support for these payments in Cannonbox's bank statements, Ira has not sufficiently rebutted Mercer's claim to damages in this regard.

Anna Lee

Anna Lee is Ira's sister. Mercer claims ESB paid Cannonbox $39,000 on account of Ms. Lee's services and Cannonbox only paid Ms. Lee $20,200. Ex. 111. Ira contracted with Ms. Lee—through Cannonbox—to provide design services for ESB. ECF 75-1 at 19; Tr. Sept. 25, 2024 at 25. Ira concedes that Cannonbox "overbudgeted" for Ms. Lee's services but argues that the $18,800 discrepancy which was never paid to Ms. Lee remained in the Cannonbox account. Tr. Sept. 25, 2024 at 25. Mercer argues in response that there were several transactions in March 2017 (the last month for which ESB was charged for Ms. Lee's services) that appear personal in nature suggesting that the excess funds were extracted from Cannonbox by Ira by paying his personal expenses. ECF 82 at 20-21.

Ira's argument that he should be credited for any amounts that were overbudgeted because the funds were never disbursed is not persuasive. Ira is conceding that ESB was

overcharged but those funds were or are still sitting in Cannonbox's bank account. This is not a defense to damages. In this Court's view, it merely points to a source of potential funds from which Ira may pay some portion of any judgment awarded to ESB.

Paul Furedi

Mercer claims ESB paid Cannonbox $48,000 on account of Mr. Furedi's services and Cannonbox only paid Mr. Furedi $42,000. Ex. 111. Ira does not dispute the discrepancy but makes the same "overbudgeting" argument he made with respect to Ms. Lee, above. ECF 75-1 at 19. Mercer responds again by pointing to a list of allegedly personal transactions by Ira in the ESB account during this time frame. ECF 82 at 21, 22.

The issue presented with respect to Mr. Furedi's payment is the same as with Ms. Lee. The result is the same and Ira is not entitled to a credit against damages with respect to this alleged "overbudgeting" error.

Lowell Glovksy

Exhibit 111 shows that ESB paid Cannonbox a total of $188,354 on account of services by Mr. Glovsky and that Cannonbox only paid a total of $180,083 to Mr. Glovsky from May 2016 through December 2018. Ex. 111. Ira testified at trial that Mr. Glovsky worked for ESB until February 2019. Tr. Sept. 25, 2024 at 26. Ira argues that Cannonbox paid a total of $194,220 to Mr. Glovsky, according to Cannonbox's general ledger. ECF 75-1 at 19. Mercer contends that Ira never invoiced ESB for these additional payments and Ira is seeking a setoff for amounts he paid Mr. Glovsky in excess of that which was billed to ESB. ECF 82 at 22.

Regardless of whether Ira's arguments improperly present a setoff defense the Court has been presented with no evidence to prove that Mr. Glovsky was paid these additional funds

except for Cannonbox's general ledger. Therefore, the Court finds that Ira has not sufficiently rebutted Mercer's claim to damages on account of the shortfall in payments to Mr. Glovsky.

<u>Bill Raiford</u>

Mercer contends that ESB was billed $20,833 for services of Bill Raiford, and $0 was actually paid to him by Cannonbox. Ex. 111. Ira explains that Bill Raiford, who Ira sought to hire full time to work at Cannonbox, is the brother of ESB's lead engineer, Eugene Raiford. Tr. Sept. 25, 2024 at 31-32. According to Ira, he billed ESB in advance to get funding but the agreement with Bill Raifold did not work out and Ira paid Bill Raifold $2,000 through his brother Eugene "for this time and consideration". *Id* at 32. Ira argues that the balance of the funds budgeted for Bill Raiford's time were not disbursed and remained in Cannonbox's account. ECF 75-1 at 20. Mercer points out that Ira has not substantiated the $2,000 payment to Eugene for Bill's services, and that Cannonbox's bank account contains frequent transactions that are personal in nature. ECF 82 at 22.

The issues presented with respect to Bill Raiford are the same as with Ms. Lee and Mr. Furedi, *supra*. The result is the same.

<u>Eugene Raiford</u>

Mercer contends that during the period April 2016 to December 2018 ESB was billed $177,500 for services of Eugene Raiford and only $164,500 was actually paid to him by Cannonbox. Ex. 111. Ira claims that Eugene Raiford worked for Cannonbox until February 2019 and Citrin's analysis omitted a payment of $7,500 made on April 15, 2019, via check #2263. ECF 75-1 at 20. Mercer argues that he was never invoiced for this additional payment and once again Ira is seeking a setoff even though he is precluded from such defense. ECF 82 at 22-23.

First, the Court notes that there is no record of check #2263 in the admitted exhibits and no bank statements to support Ira's assertion. Otherwise, the issue presented here is the same as with respect to Mr. Glovsky, above, and the result is the same.

Semih Sayginer

Mercer claims ESB was billed $3,000 by Cannonbox for the services of Semih Sayinger in August 2016, and $0 was actually paid by Cannonbox to him. Ex. 111. Ira argues that Exhibit 111 omits a cash payment of $3,000 to Mr. Sayginer on August 9, 2016, as reflected in Cannonbox's general ledger. ECF 75-1 at 20; ECF 75-3, Ex. A at 2.

Cannonbox's general ledger reflects an ATM withdrawal on August 9, 2016 in the amount of $3,000 with the notation "expense." There is nothing that identifies this as payment to Mr. Sayginer. Bank statements, even if they were provided, would not help to identify what Ira did with the $3,000 in cash he withdrew on that date. The Court will not give credit to Ira for this alleged $3,000 payment to Mr. Sayginer.

Yu Tak Ting

Exhibit 111 reflects that ESB was billed a total of $200,000 for Mr. Ting's services from December 2016 until December 2018, and only $191,666 was disbursed by Cannonbox to Mr. Ting during that time period. Ex. 111. Although not addressed in the post-trial briefs, Ira testified at the damages trial that Mr. Ting continued to work for ESB through February 2019. Tr. Sept. 25, 2024 at 34, 35. Although Ira has not specifically requested a reduction in Mercer's damages for amounts allegedly paid to Mr. Ting through February 2019, if he did that request would be denied for failure to substantiate those alleged payments.

Unknown System Administration and Roy Chung

Exhibit 111 shows that ESB was billed $4,167 per month for nine months from May 2017 to January 2018 (total $37,500) for "Unknown Sys Admin." Ex. 111. According to Mercer, the total disbursed by Cannonbox on account of these charges was $0. Ex. 111. Ira explains that these expenses are related to system administration services and network support provided by Sonus Production. Tr. Sept. 25, 2024 at 35. Ira cites to Cannonbox's general ledger and claims that ESB paid $79,167 to Sonus Production. ECF 75-1 at 20-21; ECF 75-3, Ex. A at 1-10. Ira further explains that after Sonus Production's principal, Hermann Nie, became ill and took sick leave Cannonbox, continued to budget for this service but paid the budgeted amount to William Hanisch who performed the systems administration work after Mr. Nie's departure. ECF 75-1 at 20-21. According to Ira, Cannonbox paid Mr. Hanisch $25,000 for this work which is part of the $378,100 paid to him as reflected in Exhibit 111. Ira also claims that after Mr. Nie's departure, Cannonbox paid Roy Chung for systems administration work. He claims that Cannonbox paid Mr. Chung $14,400 via check #2319 on January 11, 2019, but $7,200 of that amount was not reimbursed by ESB under system administration because this item was already over-budgeted following Cannonbox's $25,000 payment to Mr. Hanisch. ECF 75-1 at 21.

The Court can make neither heads nor tails of Ira's arguments in this respect. What the Court can discern is that by Ira's own account the alleged $25,000 payment to Mr. Hanisch was already included in Mercer's calculations in Exhibit 111. So even if it were a properly documented payment, which it is not, it appears that no credit against damages for that payment is appropriate here. As for the payments to Mr. Chung, the Court finds that without proof that Mr. Chung was paid the amount Ira claims he was paid, and proof that that payment related to the systems administration charges on Exhibit 111, the Court cannot give credit to Ira for this alleged payment.

Unknown Bookkeeping

According to Exhibit 111 Cannonbox charged ESB $3,200 on February 28, 2017 for "unknown bookkeeping," and $0 was paid out by Cannonbox on this charge. Ex. 111. Ira claims that this singular charge of $3,200 for bookkeeping services relates to services provided by Chris Villani of NexusDeep. Tr. Sept. 25, 2024 at 36. Ira argues that Cannonbox paid Mr. Villani the $3,200 for "unknown bookkeeping," and also paid an additional $12,600 for this item. ECF 75-1 at 21. This payment to Mr. Villani is undocumented and unreconciled to amounts that were invoiced to Mercer. The Court will not adjust Mercer's damages calculation based on unsupported and unreconciled claims by Ira.

Other Accounting

Unrelated to any specific category delineated in Exhibit 111, Ira seeks credit against damages for $26,319 that Cannonbox allegedly paid for accounting services performed by Steven Schlusselberg, a CPA, and Marcelo Terra, a bookkeeper. ECF 75-1 at 21 (citing to various pages of the Cannonbox general ledger). Consistent with his arguments throughout this matter, Ira is seeking to aggregate total payments into ESB and compare that to aggregated total distributions from Cannonbox to Vendors. According to Ira, as long as total distributions by Cannonbox to Vendors approximates the total paid into ESB by Mercer, there is no harm and no damages. However, that is not how this works. Bookkeeping matters. Invoices matter. Matching payments to invoices matters. Apparently, it did not matter to Ira and that is why we have the mess we are in.

ii)     <u>Discrepancies between amounts HighRock billed ESB for Telemetrics goods or services, and the amount actually paid by HighRock to Telemetrics</u>

Exhibits 116, 117, 118, and 119 reflect a discrepancy of $139,462 between the amount HighRock billed ESB for goods or services provided by Telemetrics and the amount HighRock actually paid to Telemetrics for those goods or services. Ira does not dispute that HighRock charged ESB a markup for Telemetrics goods and services. ECF 75-1 at 3-4. He argues that HighRock was entitled to charge a reasonable markup because nothing prohibited it and ESB suffered no damages. *Id*. Ira also contends that the discrepancies in Citrin's forensic analysis are overstated and any errors stem from Ira's lack of experience in bookkeeping.

The Court has already found that Ira had a duty to disclose to Mercer his billing practices and he failed to do so. *See* Non-Dischargeability Decision, ECF 45 at 14-16. A discussion of whether the markups were reasonable is precluded by this Court's prior findings. That ESB was damaged by Ira's billing practices is *res judicata* and Ira's arguments in this respect fail. Ira's argument that he should not be held liable for his lack of bookkeeping experience also fails. The Court finds that the appropriate measure of damages for this category of Mercer's claim is that Ira be held liable for any and all profits, as requested by Mercer, HighRock made on account of its transactions with ESB.

iii)     <u>Discrepancies between amounts HighRock billed ESB for goods or services provided by Vendors other that Telemetrics, and the amount actually paid by HighRock to those Vendors</u>

Mercer is seeking $43,892 in damages in this category which involves HighRock's undisclosed profits in transactions with Vendors other than Telemetrics. *See* Ex. 120. In rebuttal, Ira provides a chart explaining that HighRock did not overcharge ESB, but rather undercharged

ESB by $5,898. ECF 75-1 at 22. The Court examines Ira's arguments with respect to each Vendor below:

AJA Video Systems ("AJA")

Exhibit 120 reflects Citrin's calculation of amounts paid by ESB to HighRock as compared to the amount paid by HighRock to Vendors. This calculation shows a $6,142 discrepancy between these two amounts with respect to AJA. Ira does not dispute the overbilling of $6,142 for AJA equipment. ECF 75-1 at 23. He argues, as with Telemetrics, that HighRock was entitled to charge ESB a markup as long as it was fair. *Id.* As explained with respect to the Telemetrics markups, this argument is not persuasive.

Carom Café

Citrin's damages analysis shows that from April 26, 2016 until January 8, 2019, HighRock paid Carom Café - HighRock's landlord - $156,600 while billing ESB $173,000 for amounts owed to Carom Café, *i.e.*, a $16,400 discrepancy. Ex. 120. Ira argues that Citrin's calculation fails to give credit for additional payments to Carom Café in the total amount of $30,000 from October 2015 through January 2019. ECF 75-1 at 23; Ex. VVVV. Mercer responds that his damages analysis did not include amounts paid to Carom Café that did not correspond in amount and time to invoices to ESB. ECF 82 at 25.

Based on this Court's review of the evidence, it appears that the $30,000 additional payments for which Ira argues Citrin did not account are: $20,000 paid by check #3076 on October 10, 2015 for (according to Ira) four months advance rent (February through May 2016); and two $5,000 payments for (according to Ira) December 2018 and January 2019 rent. *Compare* Ex. VVVV *with* Ex. 122 and Ex. B.

Although HighRock's bank statements reflect a debit from HighRock's account on October 22, 2015 in the amount of $20,000 for check #3076, there is no canceled check proving that this check was negotiated by Carom Café. Ex. 134. As for the additional $10,000 allegedly paid for December 2018 and January 2019 rent the Court could find no bank records to support these payments.

Mercer's damages will not be reduced as requested by Ira for these alleged payments to Carom Café.

Fine Quality Events

Mercer claims that ESB was overbilled by $8,450 on account of this Vendor, *i.e.,* ESB was billed $12,800 by HighRock, and HighRock only paid out $4,350 to Fine Quality Events. *See* Ex. 120, 123. Ira explains that the discrepancy arises from the fact that HighRock compensated Eric Kwon, who supervised the work performed by Fine Quality Events, with billiards products valued at $8,450. ECF 75-1 at 23. Ira did not provide any documentary evidence to support this claim. The Court will not give any weight to this argument made without documentary support.

Kwang S. Ok

Mercer claims that ESB was charged $5,236 on account of Mr. Ok's services in the ESB Period, and $0 was actually paid out to Mr. Ok. *See* Ex. 120. Ira claims that HighRock paid Mr. Ok in kind, with a pool cue valued at $5,100, in satisfaction of the invoice of $5,236. Tr. Sept. 25, 2024 at 47; ECF 75-1 at 23. Other than Ira's testimony, this Court was presented with no proof to corroborate Ira's claim that Mr. Ok was paid in kind for his services. The Court is not persuaded by Ira's testimony and finds that Ira has not sufficiently rebutted Mercer's claim in this regard.

Road Cases USA

Mercer claims that ESB was invoiced twice by HighRock for goods provided by Road Cases USA, in the amounts of $2,719 and $2,175 in May and July 2018, and HighRock did not make any payment to Road Cases USA on account of these charges. Ex. 120, 125. Ira testified at trial that Eric Kwon paid these Road Cases USA invoices and in turn HighRock paid Mr. Kwon. ECF 75-1 at 23; Tr. Sept. 25, 2024 at 47-48. Ira cites to HighRock's general ledger to support his claim that HighRock paid Mr. Kwon $2,669.58 in June 2018 on account of the Road Cases USA invoices (check #3309). ECF 75-1 at 23; ECF 75-5 at 84, 123. The record at Exhibit 118 does show that check #3309 was debited from HighRock's account on July 5, 2018 in the amount of $2,669.58. There is also a check image in evidence which shows that the payee on the check was Jung Hwan Guen, and it was for "Expenses, Road cases, truck rental, UPS." Ex. 118.

Giving Ira the benefit of the doubt, this Court will assume that Eric Kwon and Jung Hwan Guen are the same person. Based on the timing and amount of the payment to Mr. Kwon which closely approximates the Road Cases USA charge to ESB, the Court will give credit to Ira for this $2,669.58 which appears to be a reimbursement to Mr. Kwon.

Verendus Industries ("Verendus")

Exhibits 120 and 128 reflect discrepancies on two separate invoices of $1,346 and $1,484 respectively between the amounts that HighRock paid Verendus and the amounts that ESB paid HighRock in relation to Verendus. Ex. 120, 128. For the first transaction, Invoice #1096 to Mercer dated February 28, 2018, Citrin's forensic analysis shows that out of the $31,002 that ESB paid HighRock for Verendus, HighRock paid only $29,656 to Verendus. *Id.* Ira claims that the "original invoice in the sum of $31,002 was adjusted upward to $32,288.49" and HighRock paid exactly that amount in three separate payments: (1) $5,376 paid via check #3261 on March

5, 2018; (2) $24,280.48 paid via check #3271 on April 5, 2018; and (3) sales tax on the transaction in the amount of $2,632.01. ECF 75-1 at 24.

The record at Exhibit 118 contains an image for check #3261 showing it was made payable to Verendus and it was debited in the amount of $5,376 from HighRock's account on March 20, 2018. The Court finds that Ira should be given credit for this HighRock payment to Verendus and Mercer's damages will be reduced by $5,376.

Regarding the second transaction, Invoice #1109 to Mercer dated April 25, 2018, Citrin's forensic analysis shows that out of the $57,302 ESB paid HighRock for Verendus, HighRock paid only $55,818 to Verendus. Ex. 120. Ira argues that the $1,484 shortfall regarding Invoice #1109 was merely an oversight and there was no intent to defraud. ECF 75-1 at 24. This argument is not persuasive as explained earlier in this Decision.

Finally, with respect to the alleged sales tax payment, the Court could find no support in the pages of the record cited to by Ira (ECF 74-4, Ex. B at 80, 81) for his claim that HighRock paid sales tax of $2,632.01 which should be attributed to HighRock payments related to Invoice #1096.

iv)  "Double Billing" Transactions

This category of damages involves HighRock's undisclosed profits in transactions with Vendors in which HighRock allegedly double-billed ESB. Mercer is seeking a total of $6,413 in damages in this category. Ex. 110, 120.

The Systems Group

Mercer claims that ESB was double-billed by $5,573 for goods or services provided by The Systems Group in 2016. Ex. 110, 127. Ira does not deny the double-billing but claims it was unintentional and only happened because The Systems Group changed its name to "Diversified"

during their course of dealings. ECF 75-1 at 24. Ira also claims that after discovering the mistake an entry was made in HighRock's general ledger on April 1, 2019 issuing a credit to ESB in the amount of $5,573. *Id.*; Tr. Sept. 25, 2024 at 48-49. Mercer argues that Ira merely entered a refund in the general ledger three years after the transaction occurred but the funds were never refunded by HighRock to ESB. ECF 82 at 26. Essentially, Mercer is seeking damages against Ira due to HighRock's issuing a credit against ESB's account, rather than a cash refund. The Court recognizes Ira's attempt to account for this double-billing and the credit that was given to ESB. Mercer's damages in the amount of $5,573 will be disallowed.

Visions Research

Ira admits that HighRock inadvertently billed ESB twice for an $840 invoice from Visions Research. ECF 75-1 at 25; Tr. Sept. 25, 2024 at 50-51; Exs. 110, 129. He claims that when this was discovered in April 2018, the mistake was noted and ESB was issued an $840 credit. ECF 75-5, Ex. B at 79, 82. Mercer argues that the funds were never refunded by HighRock to ESB. ECF 82 at 26.

As with The Systems Group, above, the Court recognizes Ira's attempt to account for this double-billing and the credit that was given to ESB. Mercer's damages in the amount of $840 will be disallowed.

v)     HighRock's "Unsupported" Disbursement of $6,000

Mercer claims there was a $6,000 disbursement from HighRock's bank account in August 2017 with no corresponding invoice to ESB. When Citrin questioned Ira about this transaction Ira produced an invoice (#1160) to ESB to support the payment which was billed to ESB as "Semih Sayginer billiard stroke high speed video experiments". Ex. 130. Ira claims that this $6,000, paid by wire transfer, was payment for services provided by Semih Sayginer, a

professional billiards player who performed high-speed filming work in the lab. ECF 75-1 at 25. However, based on the sequence of the invoice numbers Mercer claims that Invoice #1160 was generated sometime in 2018, not in 2017 when the payments were made. Tr. Oct. 31, 2023 at 97-99; ECF 82 at 27; Ex. 130.

Exhibit 130 shows the following: (1) a debit from ESB's bank account via check #1104 made out to HighRock in the amount of $6,000 dated August 12, 2017 with the notation "Semih Sayginer [illegible]"; (2) a deposit into HighRock's bank account on August 14, 2017 in the amount of $11,000; (3) a wire transfer from HighRock's bank account in the amount of $6,000 on August 15, 2017; and (4) entries in HighRock's general ledger reflecting (a) a $6,000 deposit from ESB on August 14, 2017 with the notation "Semih Sagner Payment reimbursement for $6,000 and an additional $5,000 for rent," and (b) a $6,000 payment re: "Semih Sayginer payment Research and Development." Ex. 130.

The Court finds that Ira has successfully rebutted Mercer's damage claim to the extent of $6,000 by producing the check image which contains a notation connecting the $6,000 transfer from ESB to HighRock with the $6,000 payment to Semih Sayginer, in addition to the general ledger entry as corroborating evidence. Therefore, Mercer's damage claim will be reduced by $6,000.

   c.   *Disgorgement of compensation*

Mercer invokes New York's faithless servant doctrine and seeks to recover a total of $1,655,000 paid to Ira for his services in both the Pre-ESB and ESB Periods.[13] ECF 76-1 at 13,

---

[13]    $350,000 of this amount is for the Pre-ESB Period. $1,305,000 is for the ESB Period.

20-21. According to Mercer, had he "known that [Ira] was secretly profiting off transactions on sales of goods, Mercer would not have paid any of these amounts to [Ira]." ECF 76-1 at 3.

The faithless servant doctrine is an equitable remedy grounded in the law of agency which provides that an agent who owes a duty of loyalty to his principal may be forced to forfeit all or a portion of the compensation paid to him when he is proven disloyal regardless of whether the principal suffered any provable damage as a result of the breach. *See, e.g.*, *Feiger v. Iral Jewelry,* 41 N.Y.2d 928 (1977); *City of Binghampton v. Whalen*, 131 A.D.3d 145, 146-47 (N.Y. App. Div. 2016) (function of a breach of fiduciary duty action "'is not merely to compensate the plaintiff for wrongs committed by the defendant but ... to prevent them, by removing from agents . . . all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates'") (citation omitted).

New York courts have applied two standards in determining whether the faithless servant doctrine requires disgorgement of compensation: the *Turner* standard and the *Murray* standard. *See Phansalkar v. Andersen Weinroth & Co. L.P.,* 344 F.3d 184, 201-202 (2d Cir. 2003) (citing *Turner v. Konwenhoven*, 100 N.Y. 115, 120 (1885), *Murray v. Beard*, 102 N.Y. 505, 508 (1886)). The more stringent *Turner* standard requires a showing of "substantial" disloyalty by the employee/agent. What constitutes substantial disloyalty is determined on a case-by-case basis, but disloyalty is *not* substantial under New York law where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior. *Id.* The less stringent *Murray* standard requires that the employee have acted adversely to his employer in any part of the transaction or failed to disclose any interest which would influence his conduct in dealing with the subject of the employment. *Id.* at 202. Courts in New York have applied both standards on a case-by-case basis.

Mercer argues that Ira's compensation is subject to disgorgement under either standard. To satisfy the less stringent *Murray* standard he relies on this Court's findings in the Non-Dischargeability Decision that Ira's conduct constituted fraud and breach of fiduciary duty while he was acting as Mercer's and ESB's employee/agent. *See* Non-Dischargeability Decision, ECF 45 at 22, 23. He argues that the facts of this case also satisfy the more stringent *Turner* standard because Ira's disloyalty was substantial in that Ira systematically engaged in repeated mark-ups and inappropriate transactions over an extended period of time. ECF 76-1 at 23-24.

Ira does not dispute that he was an agent of Mercer and ESB. Nor does he deny that he owed Mercer and ESB the duties of a fiduciary. *See* Non-Dischargeability Decision, ECF 45 at 2. Ira argues that the faithless servant doctrine should be construed narrowly and is available only where an employee has acted directly against the employer's interests – as in embezzlement, improperly competing with a current employer, or usurping business opportunities, *see Veritas Capital Mgt., LLC v. Campbell*, 82 A.D.3d 529, 530 (1st Dept 2011); *Linder v Innovative Comm. Sys. LLC*, 981 N.Y.S.2d 636 (Sup Ct, N.Y. Co. 2013), and only where the disloyalty is a substantial violation of the contract of service. ECF 75-1 at 5-8.

In the Non-Dischargeability Decision, which Ira has not appealed, this Court made several findings as to Ira's conduct which are worth repeating here:

> [T]he Court finds it was Ira's intention to mislead Mercer as to the true nature of his billing practices to induce Mercer to continue funding the venture. Ira's attempt to explain his behavior as harmless mistakes and poor bookkeeping are not credible. Non-Discharageability Decision, ECF 45 at 3.

> The Court finds that Mercer has satisfied his burden with respect to the false pretenses cause of action under § 523(a)(2)(A) by showing that Ira knowingly and willingly made omissions or implied misrepresentations which created a contrived and misleading understanding of the actual cost of goods and services provided to Mercer and ESB, and this was done to induce Mercer to continue to advance funds. Non-Discharageability Decision, ECF 45 at 14.

44

As a fiduciary, Ira had a duty to disclose the material facts of his billing practices, and the Court finds that his failure to do so constituted omissions or implied misrepresentations. Non-Dischargeability Decision, ECF 45 at 15.

[T]he Court finds that the markups created a misleading understanding of the transactions on Mercer's part. Non-Dischargeability Decision, ECF 45 at 16.

The Court finds that Ira's conduct [] wrongfully induced Mercer to continue funding the billiards project. *Id.*

The Court finds that Ira made multiple false or misleading written statements to Mercer and ESB each time he submitted invoices to Mercer for payment representing the cost of the goods and services being procured on behalf of Mercer and ESB. Non-Dischargeability Decision, ECF 45 at 17.

The Court finds Ira's use of Cannonbox as an intermediary to bill Mercer and ESB for services is further evidence of his intent to deceive. . . .  The Court finds Ira's excuse for billing through Cannonbox to be implausible and that it is more likely that Ira billed Mercer through Cannonbox to inflate the cost of his and others' services and to deceive Mercer as to the actual cost of services provided. Non-Dischargeability Decision, ECF 45 at 19.

[T]he Court finds that the invoices Ira provided to Mercer and ESB were intended to, and did, cause Mercer to provide funds to ESB to, in turn, pay the HighRock and Cannonbox invoices, all to Ira's ultimate benefit. Non-Dischargeability Decision, ECF 45, ECF 45 at 20.

[T]he Court finds that Ira was acting [as a fiduciary] at all times relevant to this Decision. Non-Dischargeability Decision, ECF 45 at 23.

This Court concluded that Ira breached his duty of loyalty by failing to disclose secret profits on transactions involving his companies, Mercer and ESB. *See* Non-Dischargeability Decision, ECF 45 at 12.

Applying either the *Turner* or the *Murray* standards to the facts of this case, the Court finds that Ira's misconduct warrants disgorgement of compensation under the faithless servant doctrine. The Court has already found that Ira engaged in fraudulent conduct with the intention of secretly profiting from transactions between HighRock, Cannonbox, Mercer and ESB, while he was acting as a fiduciary. This is law of the case. Ira's disloyalty was substantial because it

was not limited to a single act, an isolated incident; rather it was systematic as he engaged in repeated fraudulent mark-ups and inappropriate transactions over an extended period of time.

The Court rejects Ira's argument that the faithless servant doctrine does not require disgorgement in this case because (i) he was guilty only of poor budgeting and bookkeeping, (ii) his job performance did not suffer as a result of his conduct, (iii) the monetary damage was nominal in the context of the project, and (iv) any markups he charged Mercer and ESB were still fair market prices. First, whether the principal-employer benefited or did not suffer provable damages as a result of the breach of fidelity does not affect the faithless servant analysis. *See Feiger,* 41 N.Y.2d. at 928-29. Second, a finding of disgorgement under the faithless servant doctrine is not affected by the simultaneous finding of damages of the return of secret profits. Disgorgement of an agent's salary is not intended to effectuate a return of the secret profits back to the principal. *See Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133, 138 (1936) ("Not only must the employee or agent account to his principal for secret profits, but he also forfeits his right to compensation for services rendered by him if he proves disloyal.") (citations omitted)

New York law, however, does permit apportionment of disgorged compensation which if applicable would limit the forfeiture to compensation paid during certain periods of time or with respect to the completion of certain tasks during which the employee was disloyal. *See Musico v. Champion Credit Corp.*, 764 F.2d 102, 113 (2d Cir. 19985). In *Musico* the court held that apportionment was appropriate where the disloyal agent performed various tasks under a number of separate agency agreements and the agent's misdealing with respect to one task had neither tainted nor interfered with the completion of the other tasks. *Id.* at 114. As pointed out by the *Musico* court, courts that require disgorgement of all compensation without apportionment do so based on a finding that the breach of duty "tainted all of the dealings between the parties." *Id.*

Ira argues that if any disgorgement is granted by this Court, it should be limited to his "period of disloyalty" which only encompassed the dates of the marked up Telemetrics and AJA invoices - from February 13, 2018 through July 1, 2018. ECF 75-1 at 6-7; Ex. 116. Mercer disagrees and argues that Ira's fraud and breach of fiduciary duty lasted over several years, nearly the entirety of their business relationship. ECF 82 at 10.

The Court finds that Ira's breach of fiduciary duty and fraud tainted all of the dealings between the parties and Ira must disgorge the entirety of the salary paid to him during the Pre-ESB and ESB periods without apportionment. The apportionment applied in *Musico* is distinguishable from the facts presented in this case. Ira was a salaried employee; his compensation was not paid according to specific transactions. Ira was the sole officer of ESB and was responsible for the day-to-day tasks of the development of billiards-related technologies. ECF 44-4, ¶¶ 29, 50, 54-55. Therefore, apportionment under *Musico* is not appropriate. Ira's compensation will be disgorged as requested by Mercer.

## 6. Attorney's fees and expenses

Mercer is seeking to recover attorney's and expert fees and costs in the total amount of $607,551.51[14] as the "prevailing plaintiff" in this action. Under the American Rule, "attorney['s] fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule." *Glenn v. Hoteltron Sys., Inc.*, 74 N.Y.2d 386, 393 (1989) (citation omitted). Mercer does not claim any agreement of the parties that would allow him to recover attorney's fees and costs in this litigation. Nor does he rely on a "court rule." Rather, to abrogate the American Rule

---

[14]     Of this amount, Mercer seeks attorney's fees in the amount of $535,768.65, and expert fees/costs in the amount of $71,782.86, for a total award of $607,551.51. The attorney fee award includes a 10% reduction to support a finding of reasonableness. ECF 74-18 at 7.

Mercer relies on § 626 of New York Business Corporation Law which allows for, but does not require, the imposition of attorney's fees to the prevailing party in a shareholder derivative action. *See* N.Y. Bus. Corp. Law § 626(e).

In opposition, Ira cites to § 523(d) and argues that this very specific provision which allows attorney's fees to a prevailing *defendant* in a § 523(a) action should preclude the award of attorney's fees to the prevailing plaintiff under the doctrine of *expressio unius est exclusio alterius*, "the expression of one thing is the exclusion of the other."

The Court agrees with Ira that the prevailing plaintiff in a § 523 action generally is not entitled to recover attorney's fees from the debtor/defendant. However, this adversary proceeding is not only a § 523 action, but also a derivative action and an action under § 502(b) in that Mercer is asserting a claim on his own behalf and on behalf of ESB.

Assuming Mercer preserved the right to assert a claim for post-petition attorney's fees in his proof of claim,[15] he still must prove an entitlement to collect those fees from Ira under one of the exceptions to the American Rule and this Court must determine whether it will exercise its discretion to award them. *Cf. Ogle v. Fidelity & Deposit Co. of Maryland*, 586 F.3d 143 (2d Cir. 2009) (finding that that nothing in § 506(b) precludes an *unsecured* creditor from collecting post-

---

[15]    Although Mercer's proof of claim filed with this Court did not specifically seek post-petition attorney's fees for litigating this matter, there was a reservation of rights contained in the proof of claim: "Mr. Mercer reserves the right to amend and/or supplement this Claim at any time and in any manner and/or to file additional proofs of claim for any additional amounts and/or claims that may be based on information not yet known, or the same or additional documents or grounds of liability, including, but not limited to, additional administrative expenses arising after the petition date." Proof of Claim No. 11. The Court also notes that the proof of claim was based on Plaintiff's pre-petition causes of action against the Debtors seeking to establish their liability for breach of fiduciary duty and fraud. In that lawsuit, Mercer specifically sought costs and disbursements in the action, "including reasonable attorney's fees and experts' fees, costs and expenses". Rider to Proof of Claim No. 11.

petition attorney fees as long as the right to those attorney fees was allowed under the agreement of the parties), *cert. denied*, 559 U.S. 1092 (2010); *In re Qmect, Inc.*, 359 B.R. 266 (Bankr. N.D. Cal. 2006) (unsecured creditor entitled to include in its claim post-petition attorney's fees for litigating issues governed by non-bankruptcy law provided the creditor has a right to recover its attorney's fees based on contract *or statute*).

New York Business Corporation Law § 626(e), upon which Mercer relies, provides:

> (e) If the action on behalf of the corporation was successful, in whole or in part, or if anything was received by the plaintiff or plaintiffs or a claimant or claimants as the result of a judgment, compromise or settlement of an action or claim, the court *may award* the plaintiff or plaintiffs, claimant or claimants, reasonable expenses, including reasonable attorney's fees, *and shall direct him or them to account to the corporation for the remainder of the proceeds so received by him or them*. This paragraph shall not apply to any judgment rendered for the benefit of injured shareholders only and limited to a recovery of the loss or damage sustained by them.

N.Y. Bus. Corp. Law § 626(e) (emphasis added).

According to the New York Court of Appeals in *Glenn v. Hoteltron Sys., Inc.*,

> Although Business Corporation Law § 626(e) provides that a successful plaintiff in a shareholders' derivative action may recoup legal expenses and attorney['s] fees from the proceeds of a judgment, compromise or settlement in favor of the corporation, *it does not authorize the imposition of such expenses on the losing party*.

> The basis for an award of attorney['s] fees in a shareholders' derivative suit is to reimburse the plaintiff for expenses incurred on the corporation's behalf. . . . *Those costs should be paid by the corporation, which has benefited from the plaintiff's efforts and which would have borne the costs had it sued in its own right.* Thus, the Appellate Division was correct in modifying Supreme Court's judgment to provide for the payment of Kulik's legal expenses out of the award to Ketek Corp. rather than by Schachter.

*Glenn v. Hoteltron Sys., Inc.*, 74 N.Y.2d at 393-94 (1989) (emphasis added) (citation omitted).

Therefore, under *Glenn v. Hoteltron Sys.*, any attorney's fees and costs awarded to Mercer in this case on account of his derivative claims against Ira would be paid to Mercer out of any award to ESB. *Id. See also Kaplan v. Rand*, 192 F.3d 60, 70 (2d Cir. 1999) ("Attorney['s]

49

fees may be awarded under New York law to an attorney for a successful derivative plaintiff out of a recovery obtained on behalf of the corporation from the defendants."). New York Business Corporation Law § 626(e) does not give this Court authority to award Mercer attorney's fees *in addition to* the damages awarded to ESB.

The Court finds that Mercer is entitled to recover his reasonable attorney's and expert fees and costs out of any amounts collected by ESB from Ira. This Court now must determine what is reasonable. Courts determining the reasonableness of fees are generally guided by the lodestar analysis which creates a presumptively reasonable fee by calculating the reasonable number of hours by a reasonable hourly rate. *See Queenie, Ltd. v. Nygard Intern.*, 204 F. Supp. 2d 601, 607-08 (S.D.N.Y. 2002). According to Mercer, his attorney's and expert fees are reasonable as requested because (i) he is only seeking fees and costs associated with prosecution of the adversary proceeding which was filed in June 2022 not with respect to the litigation prior to the bankruptcy, (ii) this was a complex case, (iii) the partner and associate rates charged on this matter ranged from $510 to $670, and $350 to $420, respectively, which is reasonable considering the size of the firm and the experience of the attorneys who worked on the matter, (iv) Citrin's charges are reasonable and customary for an engagement of this scope and complexity, and (v) a voluntary 10% reduction in attorney's fees was applied "to further support the reasonableness of this request." ECF 74 at 7.

Ira argues that if this Court awards any fees and costs on account of Mercer's derivative claims it may only award those which relate to the ESB Period. He is correct in pointing out that Mercer's attorneys' time records do not distinguish between time spent on the direct claims as opposed to the derivative claims. ECF 80 at 4.

The Court finds that counsel's hourly rates ranging from $510 to $670, and $350 to $420 for partners and associates is reasonable in this District and considering the work performed on this matter. The Court also finds that the number of hours spent by counsel on this matter is reasonable given the complexity of the facts and the legal issues presented in this case. These findings are further supported by the voluntary 10% reduction in attorney's fees requested by Mercer. Finally, the Court finds that Citrin's expert fee of $71,782.86 is also reasonable given the complexity of this case. However, this Court agrees with Ira that fees and costs must be apportioned between the Pre-ESB (direct claims) and ESB (derivative claims) Periods. It would be impossible and unreasonable to expect counsel and Citrin to itemize time spent on the direct versus the derivative claims. For this reason, the Court finds it is appropriate to apportion the award of attorney's and expert fees and costs based upon the amount of damages awarded in each category. $2,293,539 in damages were awarded in total. Of that $1,589,153 (69%) are attributable to the ESB Period derivative claims. For that reason, this Court will award Mercer 69% of the attorney's and expert fees and costs requested in his motion, *i.e.*, $419,210.19. The Court finds this to be reasonable under the circumstances of this case.

## CONCLUSION

This Court finds that Ira is liable to Mercer, individually and derivatively, in the total amount of $2,293,539.42. Mercer shall have a direct claim against Ira in the amount of $704,386, and a derivative claim in the amount of $1,589,153.42. This represents a reduction of $20,458.58 in the damages awarded to Mercer derivatively as a shareholder of ESB. The Court further finds that Mercer is entitled to recover $419,201.19 in attorney's and expert fees and costs out of any amounts collected by ESB from Ira.

Mercer is directed to submit a proposed judgment consistent with this Decision within seven days of entry of this Decision.



Dated: Central Islip, New York
May 29, 2025

Robert E. Grossman
United States Bankruptcy Judge